## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TIMOTHY B. LENNON,

MARK S. BELENCHIA,

ALFRED L. ANTONSEN, JR.,

JOSEPH PISCITELLI,

SHAUN A. DOUGHERTY,

MARK CRAWFORD,

     Plaintiffs,

v.

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS and

HOLY SEE, in its Capacity as a Foreign State (State of the Vatican City), and in its Capacity as an Unincorporated Association and Head of an International Religious Organization,

     Defendants.

CIVIL ACTION NO. 18-cv-2618

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT AND JURY DEMAND

# TABLE OF CONTENTS

NATURE OF THE CASE ........................................................................................................ 1

JURISDICTION AND VENUE .............................................................................................. 7

PARTIES ................................................................................................................................ 11

FACTS ................................................................................................................................... 17

    I.   A brief history of child sexual abuse by Catholic Clergy in the United States ................. 17

    II. Defendants have repeatedly failed and refused to properly address Clergy child sexual
       abuse ........................................................................................................................ 26

DEFENDANTS' PATTERN OF UNLAWFUL ACTIVITY UNDER 18 U.S.C., *ET SEQ*;
INTERSTATE AND INTERNATIONAL MAIL AND WIRE FRAUD ................................... 33

CLASS ACTION ALLEGATIONS ........................................................................................ 38

CLAIMS FOR RELIEF/CAUSES OF ACTION ................................................................... 42

    COUNT I       Violation of 18 U.S.C. § 1962(c) ................................................ 42

    COUNT II      Violation of 18 U.S.C. § 1962(d) by Conspiring to
                      Violate 18 U.S.C. § 1962(c) ...................................................... 44

    COUNT III    Assault ...................................................................................... 47

    COUNT IV    Breach of Fiduciary Duty .......................................................... 48

    COUNT V     Negligence/Gross Negligence .................................................... 50

    COUNT VI    Negligence *Per Se* ................................................................... 54

    COUNT VII  Intentional Infliction of Emotional Distress ................................ 57

    COUNT VIII Wrongful Death and Survival Actions ...................................... 58

    COUNT IX    Public Nuisance ........................................................................ 59

    COUNT X     Conspiracy ................................................................................ 62

    COUNT XI    Aiding and Abetting .................................................................. 63

    COUNT XII  Medical Monitoring ................................................................... 64

COUNT XIII  Restitution ..................................................................................................... 65

COUNT XIV  Declaratory and Injunctive Relief ............................................................... 66

*RESPONDEAT SUPERIOR*/AGENCY ...................................................................................... 71

COMMAND RESPONSIBILITY DOCTRINE ........................................................................ 71

TOLLING OF THE STATUTES OF LIMITATION ................................................................. 72

RELIEF REQUESTED ............................................................................................................... 73

JURY DEMAND ........................................................................................................................ 76

*[B]ut people loved darkness instead of light because their deeds were evil. Everyone who does evil hates the light and will not come into the light for fear that their deeds will be exposed.[1]*

*Have nothing to do with the fruitless deeds of darkness, but rather, expose them.[2]*

Plaintiffs Timothy B. Lennon, Mark S. Belenchia, Alfred L. Antonsen, Jr., Joseph Piscitelli,  Shaun A. Dougherty, and Mark Crawford (collectively "Plaintiffs"), individually and on behalf of all similarly situated persons in the United States[3] (the "Class Members"), and based upon known facts and upon information and belief, respectfully complain of the actions of Defendants United States Conference of Catholic Bishops ("USCCB") and the Holy See, in its Capacity as a Foreign State (State of the Vatican City), and in its Capacity as an Unincorporated Association and Head of an International Religious Organization     ("Holy See") (together, "Defendants"):

## NATURE OF THE CASE

1.      This case is about the endemic, systemic, rampant, and pervasive rape and sexual abuse of Plaintiffs and Class Members perpetrated by Roman Catholic Church cardinals, bishops, monsignors, priests, sisters, lay leaders, members of Catholic religious orders, educators, and other of Defendants' personnel, members, agents, and representatives (collectively, "Clergy" or "Catholic Clergy") while serving in active ministry—with the knowledge of Defendants. Rather than safeguarding and protecting Plaintiffs and Class Members—who were minor children at the time—Defendants protected the abusive Clergy, took extraordinary measures to conceal their wrongful conduct, moved them from parish to parish,

---

[1]      John 3:19-20 (NIV).

[2]      Ephesians 5:11 (NIV)

[3]      Unless otherwise noted, the term "United States" hereafter includes the United States and the Territory of the U.S. Virgin Islands.

without warning church members or the general public, thereby further facilitating their predatory practices, failed and refused to report the abusive Clergy to law enforcement or other responsible authorities as required by law, and—incredibly—even promoted the abusive Clergy. Defendants' wrongful acts are ongoing and continuous.

2.      This also is a RICO case brought pursuant to 18 U.S.C. §§ 1961-68. Plaintiffs' Complaint is grounded on multiple violations of the federal mail and wire fraud statutes embodied in the RICO statute prohibiting "schemes to defraud" where the fraud is "representational" or where the fraud amounts to "cheating and defrauding" without representations. This Complaint alleges violations of the federal mail fraud and wire fraud statutes in both ways.

3.      The RICO enterprise alleged in this Complaint is the Roman Catholic Church in the United States, an unincorporated association-in-fact composed of (i) 33 territorial archdioceses, (ii) 145 territorial dioceses, (iii) the Archdiocese for the USA Military Services, (iv) the Personal Ordinariate of the Chair of Saint Peter within the Roman Rite, and (v) two archeparchies and 16 eparchies in the Eastern Catholic Churches and their corresponding priests and other Clergy. This association-in-fact enterprise will be referred to as the "Church Enterprise" or the "Enterprise." As of 2017, there were over 37,000 Catholic priests and other Clergy in the Church Enterprise. Each diocese is headed by a bishop who, in turn, is a member of Defendant USCCB. The RICO Defendants conducting and participating, directly and/or indirectly, in the affairs of the Church Enterprise to injure and harm Plaintiffs and Class Members via the mails and wires are Defendant USCCB and Defendant Holy See.

4.      Since at least 1940 (and possibly earlier) Defendants, utilizing the Enterprise, have engaged (and continue to engage) in unlawful and intentional schemes to (i) defraud Plaintiffs and Class Members via misrepresentations and omissions (on which Plaintiffs, Class

Members, Defendants, the Clergy, and/or other third parties justifiably relied), and (ii) defraud Plaintiffs and Class Members by cheating them by means of false or fraudulent pretenses—first subjecting Plaintiffs and Class Members to Clergy sexual abuse, then covering up and concealing the sexual abuse so as to maintain Defendants' reputations and maintain and expand their commercial operations in the United States whereby Defendants and the Enterprise obtained (and continue to obtain) money, funds, credits, assets, and/or other property, and, in the process, cheating and defrauding Plaintiffs and Class members out of their childhood, youth, innocence, virginity, families, jobs, finances, assets—in short, their lives. Defendants carried out these schemes to defraud through the Enterprise using the United States and international mail in violation of 18 U.S.C. § 1341. Defendants also carried out these schemes to defraud through the Enterprise using interstate and international telephone calls and electronic communications in violation of 18 U.S.C. § 1343.

5.     Defendants' schemes to defraud involved (and continue to involve) means of false or fraudulent pretenses and/or fraudulent and intentionally misleading representations and omissions, including, *inter alia*, (i) Defendants (and the Clergy) secretly misrepresenting to Plaintiffs and Class Members—through their words and deeds—that they were men of faith who had Plaintiffs' and Class Members' best interests at heart, and then, knowing that Plaintiffs and Class Members relied on their representations and put their faith and trust in the Clergy as their spiritual leaders, took advantage of their positions of power and influence and sexually abused Plaintiffs and Class Members, (ii) Defendants (and the Clergy) misrepresenting to Plaintiffs, Class Members, Defendants, the Clergy, and/or other third parties—explicitly and/or implicitly—that the wrongful sexual abuse did not occur (denial and deceit), (iii) Defendants (and the Clergy) shifting the focus of the allegations to Plaintiffs and Class by painting them as liars, alleging Plaintiffs and Class Members falsified the charges, or that they suffered from some

3

mental illness giving rise to their allegations of Clergy sexual abuse, and (iv) Defendants (and the Clergy) actively and fraudulently concealing the Clergy's wrongful sexual abuse by, among other things, (a) burying the charges deep within Defendants' organizations and affirmatively deciding not to publicize, properly investigate, or act on them, (b) failing and refusing to terminate, or even discipline, abusing Clergy, (c) moving the abusive Clergy from parish to parish, without warning church members or the general public, thereby further facilitating their predatory practices, failing and refusing to report the abusive Clergy to law enforcement or other responsible authorities as required by law, and even promoting abusive Clergy, and (iv) using all available means to look the other way, deny, obstruct the investigation of, and conceal Clergy sexual abuse. Defendants' wrongful acts are open-ended, ongoing, and continuous.

6.     As a direct and proximate result of Defendants' (and the Clergy's) above-referenced wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence, *inter alia*, (i) Plaintiffs and Class Members have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages to themselves, their businesses and/or their property, (ii) Defendants have maintained (and will continue to maintain) their reputations and maintained and expanded (and will continue to expand and maintain) their commercial operations in the United States whereby Defendants and the Enterprise obtained (and will continue to obtain) money, funds, credits, assets, and/or other property, and (iii) Defendants wrongfully shifted the risk, expense, and pain, and suffering of the Clergy sexual abuse to Plaintiffs and Class Members and robbed them of their childhood, youth, innocence, virginity, families, jobs, finances, assets—in short, their lives. Defendants' schemes to defraud also amounted to a cheat against Plaintiffs and Class Members. Defendants intentionally engaged (and continue to engage) in these wrongful actions, inaction, omissions,

cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence to their financial and reputational benefit, and to Plaintiffs' and Class Members' personal, mental, psychological, and financial detriment.

7.     Defendants' wrongful conduct flagrantly violates other laws of the United States, the common law of the states, federal common law, Catholic Church canon law, and customary international law, including treaties and conventions adopted and signed by Defendant Holy See. These laws make childhood sexual abuse a crime, impose duties to report known or suspected child abuse, require organizations and individuals to act in the best interests of children, and establish civil responsibility—all in an attempt to protect children from harm. Child sexual abuse violates international human rights standards and conventions adopted by virtually all civilized nations. The financial, emotional, and psychological fallout from Defendants' wrongful conduct and their corresponding cover-up in the United States and the Holy See has had a devastating effect on Plaintiffs, Class Members, and their families.

8.     Plaintiffs, therefore, for themselves and Class Members, bring this action against Defendants as a national class action under Title XI ("RICO") of Public Law 91-452, 84 Stat. 922 (1970) (as codified at 18 U.S.C. §§ 1961–1968, as amended) and the common law for engaging in the above-described intentional schemes and unlawful conduct. At all relevant times, by their wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence, Defendants conducted and participated, directly and/or indirectly, in the affairs of the Church Enterprise through a pattern of wrongful activity—to wit, Defendants engaged in repetitious and systematic interstate and international mail and wire fraud in violation of 18 U.S.C. §§ 1341; 1343 by using or causing the use of the mails and wires in interstate and international commerce to intentionally, repeatedly and systematically devise, engage in, condone and/or ratify the above-described schemes to

defraud. Defendants' wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence unlawfully cheated and defrauded Plaintiffs and Class Members—and continue to do so.

9.      At all relevant times, by their wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence, (i) Defendants conducted or participated in the affairs of the Church Enterprise—as described above—in violation of 18 U.S.C. § 1962(c)); and/or (ii) conspired to violate 18 U.S.C. § 1962(c) (in violation of 18 U.S.C. § 1962(d)).

10.     Defendants agreed to commit, committed, and continue to commit these substantive RICO offenses (*i.e.*, the above-described unlawful and intentional schemes through the Enterprise) by engaging in multiple predicate acts of interstate and international mail and wire fraud—all the while knowing of, and intentionally agreeing to, the overall wrongful objectives of their schemes. Defendants knew their conduct was wrongful, yet intentionally engaged in the above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence to unlawfully cheat, defraud, and take unlawful and unfair advantage of Plaintiffs and Class Members—and continue to do so.

11.     In addition to violating the RICO statute, Defendants' above-described unlawful and intentional schemes, actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence constitute assault, breach of fiduciary duty, negligence/gross negligence, negligence *per se*, intentional infliction of emotional distress, wrongful death, public nuisance, conspiracy, and aiding and abetting.

12.     Plaintiffs, therefore, for themselves and Class Members, seek to recover from Defendants damages and compensation in the form of (i) compensatory damages (or,

alternatively, restitution), (ii) economic damages, (iii) punitive damages, (iv) RICO treble damages, (v) medical monitoring, (vi) pre- and post-judgment interest, and (vii) attorneys' fees, litigation expenses, and court costs. Plaintiffs, for themselves and Class Members, also seek declaratory and injunctive relief to compel Defendants to, *inter alia*, comply with various state statutes requiring them to report the abusive Clergy to law enforcement or other responsible authorities, terminate the abusive Clergy, identify the abusive Clergy to the general public so that parents may protect their children going forward, release documents evidencing such Clergy abuse to achieve transparency, and such other relief the Court deems just and proper.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over Plaintiffs' claims under (i) 18 U.S.C. § 1961, *et seq.,* under 18 U.S.C. § 1964(a); (c) (RICO), and (ii) 28 U.S.C. § 1332(d) (CAFA), because (i) there are 100 or more Class Members, (ii) at least one Class Member is a citizen of a state diverse from the citizenship of Defendants, and (iii) the matter in controversy exceeds $5,000,000 USD, exclusive of interest and costs.

14.     This Court also has jurisdiction over Plaintiffs' claims against Defendant Holy See under 28 U.S.C. § 1330(a) because it is a "foreign state" within the meaning of 28 U.S.C. § 1603 falling within the exceptions to sovereign immunity set forth in 28 U.S.C. §§ 1605(a)(1); (a)(2); (a)(5).

15.     **Exception to sovereign immunity—waiver—under 28 U.S.C. §§ 1605(a)(1).** Defendant Holy See has implicitly or explicitly waived any rights under, and/or is estopped from raising, the Foreign Sovereign Immunities Act (28 U.S.C. § 1604) as a defense to suit by, among other things, (i) failing to raise such defense for decades in settling and acquiescing in settlements of child rape and sexual abuse claims against itself and/or its Clergy, agents, and representatives (including, without limitation, the Church Enterprise and Defendant USCCB) in

the United States over which it exercises absolute control and authority under its own canon law, regulations, directives, policies, and procedures, and (ii) the transmission to, and receipt from, the United States of directives, orders, policies, procedures, and other direction or guidance, whether explicit or implicit. Defendant Holy See's wrongful conduct presents fundamental issues of human rights and the protection of children. Such actions have never been given immunity by the United States government. Moreover, fundamental human rights violations were subject to accountability in United States courts prior to the enactment of the Foreign Sovereign Immunities Act. In enacting the Foreign Sovereign Immunities Act, there is no evidence that the United States Congress intended to immunize such fundamental human rights of children from accountability in United States courts. Defendant Holy See, therefore, is not entitled to sovereign immunity under 28 U.S.C. §§ 1605(a)(1).

16.     **Exception to sovereign immunity for conducting commercial activity under 28 U.S.C. §§ 1605(a)(2).** Defendant Holy See's wrongful conduct is based on commercial activity carried on in the United States, acts performed in the United States in connection with Defendant Holy See's commercial activity elsewhere, and/or upon acts outside the territory of the United States in connection with Defendant Holy See's commercial activity elsewhere that caused a direct effect in the United States. Defendant Holy See's commercial activities encompass both a regular course of commercial conduct, including, without limitation, fundraising activities, real estate transactions, and other commercial transactions or acts. Such commercial activities have had (and continue to have) substantial contact with the United States, including (i) acts performed in the United States, (ii) funds raised from persons, entities, agencies, agents, and representatives (including, without limitation, Defendant USCCB) in the United States and sent to Defendant Holy See from the United States, (iii) real estate purchased and sold in the United States, (iv) explicit and implicit policy directives sent by Defendant Holy

See to Defendant USCCB, the Enterprise, Clergy, and other agents and representatives in the United States, and (v) other substantial consequences for persons within the United States resulting from Defendant Holy See's actions—directly and/or under the doctrine of *respondeat superior*, agency theory, and/or the command responsibility doctrine. Defendant Holy See, therefore, is not entitled to sovereign immunity under 28 U.S.C. §§ 1605(a)(2).

17.    **Exception to sovereign immunity for causing personal injury in the United States under 28 U.S.C. §§ 1605(a)(5).** Plaintiffs, for themselves and Class Members, seek money damages from Defendant Holy See for personal injuries in the United States caused—directly and/or the doctrine of *respondeat superior*, agency theory, and/or the command responsibility doctrine—by Defendant Holy See's tortious acts or omissions and/or the tortious acts or omissions of Defendant Holy See's Clergy, agents, and representatives (including, without limitation, the Enterprise and Defendant USCCB) while acting within the scope of their office or employment within the United States. Such acts within the United States include, without limitation, the negligent hiring, supervision, direction, and control of Defendant Holy See's Clergy, agents and representatives (including, without limitation, Defendant USCCB) in the United States, as effectuated within the United States, thereby resulting in a pattern of serious personal injury to children in the United States. Defendant Holy See's failure to hire, supervise, direct, and control its Clergy, agents, and representatives (including, without limitation, the Enterprise and Defendant USCCB) in the United States constitutes a breach of mandatory obligations under United States and international law. Nor do Defendant Holy See's longstanding directives and refusal to comply with various states' criminal statutes mandating the reporting of child rape and sexual abuse constitute "discretionary acts or functions." The acts and omissions of Defendant Holy See's Clergy, agents, and representatives (including, without limitation, the Enterprise and Defendant USCCB) in covering up and concealing known criminal

acts of child sexual abuse by its Clergy and other agents amount to criminal conduct by aiding, abetting, enabling, and being in criminal complicity with the crime of child rape and sexual abuse, reckless endangerment, and obstruction of justice. Nor do Plaintiffs' claims against Defendant Holy See arise out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights, but rather, arise out of the doctrine of *respondeat superior*, agency theory, and/or the command responsibility doctrine, violations of customary international law, assault, breach of fiduciary duty, negligence/gross negligence, negligence *per se*, intentional infliction of emotional distress, wrongful death, public nuisance, conspiracy, and aiding and abetting. Defendant Holy See, therefore, is not entitled to sovereign immunity under 28 U.S.C. §§ 1605(a)(5).

18.     This Court also has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 because Plaintiffs allege violations of customary international law as codified in international treaties, including, without limitation, the *Universal Declaration of Human Rights* and the *Convention on the Rights of the Child*. Customary international law, as well as treaties and acts of Congress, are the "supreme law of the land" under Article VI of the United States Constitution. Issues of interpretation and application of such customary international law provide federal question jurisdiction under 28 U.S.C. § 1331.

19.     This Court also has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332 because the matter in controversy as to each individual Plaintiff exceeds the sum of $75,000, exclusive of interest and costs, and the controversy is between citizens of a state or states (the United States) and a foreign state (Defendant Holy See).

20.     This Court also has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1367 (supplemental jurisdiction).

21.     This Court has *in personam* jurisdiction over Defendants because at all relevant

times, one or both Defendants, directly and/or through their agents and representatives (including, without limitation, the Enterprise and Defendant USCCB) resided, were found, and conducted business in the District of Columbia. This Court also has *in personam* jurisdiction over Defendants because at all relevant times, one or both Defendants, directly and/or through the Clergy, their agents and representatives (including, without limitation, the Enterprise and Defendant USCCB), (i) caused tortious injury by an act or omission in the District of Columbia, (ii) caused tortious injury in the District of Columbia by an act or omission committed outside the District of Columbia, and/or (iii) engaged in a persistent course of conduct, or derived substantial revenue from goods used or consumed or services rendered in the District of Columbia, and the tortious injury occurring in the District of Columbia arose out of such activity. This Court, therefore, also has *in personam* jurisdiction over Defendant Holy See under 28 U.S.C. § 1330(b).

22.     At all relevant times, and as set forth above, one or both Defendants resided, were found, and conducted business in the District of Columbia. Accordingly, venue is proper in this Court under 28 U.S.C § 1391(a).

## PARTIES

23.     Plaintiff Timothy B. Lennon is a citizen and resident of Arizona. Plaintiff Lennon is a victim and survivor of Clergy sexual abuse. Plaintiff Lennon was a minor, United States citizen, and resident of the State of Iowa at the time the abuse occurred. As a direct and proximate result of Defendants' (and the Clergy's) wrongful conduct, Plaintiff Lennon has suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages. Plaintiff Lennon brings this action on behalf of himself and all similarly situated Catholic Church Clergy child sexual abuse victims in the United States.

24.     Plaintiff Mark S. Belenchia is a citizen and resident of Mississippi. Plaintiff Belenchia is a victim and survivor of Clergy sexual abuse. Plaintiff Belenchia was a minor, United States citizen, and resident of the State of Mississippi at the time the abuse occurred. As a direct and proximate result of Defendants' (and the Clergy's) wrongful conduct, Plaintiff Belenchia has suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages. Plaintiff Belenchia brings this action on behalf of himself and all similarly situated Catholic Church Clergy child sexual abuse victims in the United States.

25.     Plaintiff Alfred L. Antonsen, Jr. is a citizen and resident of Illinois. Plaintiff Antonsen is a victim and survivor of Clergy sexual abuse. Plaintiff Antonsen was a minor, United States citizen, and resident of the State of Illinois at the time the abuse occurred. As a direct and proximate result of Defendants' (and the Clergy's) wrongful conduct, Plaintiff Antonsen has suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages. Plaintiff Antonsen brings this action on behalf of himself and all similarly situated Catholic Church Clergy child sexual abuse victims in the United States.

26.     Plaintiff Joseph Piscitelli is a citizen and resident of California.  Plaintiff Piscitelli is a victim and survivor of Clergy sexual abuse. Plaintiff Piscitelli was a minor, United States citizen, and resident of the State of California at the time the abuse occurred. As a direct and proximate result of Defendants' (and the Clergy's) wrongful conduct, Plaintiff Piscitelli has suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages. Plaintiff Piscitelli brings this action on behalf of himself and all similarly situated Catholic Church Clergy child sexual abuse victims in the United States.

27.     Plaintiff Shaun A. Dougherty is a citizen and resident of Pennsylvania.  Plaintiff Dougherty is a victim and survivor of Clergy sexual abuse. Plaintiff Dougherty was a minor, United States citizen, and resident of the State of Pennsylvania at the time the abuse occurred. As a direct and proximate result of Defendants' (and the Clergy's) wrongful conduct, Plaintiff Dougherty has suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages. Plaintiff Dougherty brings this action on behalf of himself and all similarly situated Catholic Church Clergy child sexual abuse victims in the United States.

28.     Plaintiff Mark Crawford is a citizen and resident of New Jersey. Plaintiff Crawford is a victim and survivor of Clergy sexual abuse. Plaintiff Crawford was a minor, United States citizen, and resident of the State of New Jersey at the time the abuse occurred. As a direct and proximate result of Defendants' (and the Clergy's) wrongful conduct, Plaintiff Crawford has suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages. Plaintiff Crawford brings this action on behalf of himself and all similarly situated Catholic Church Clergy child sexual abuse victims in the United States.

29.     Defendant United States Conference of Catholic Bishops (USCCB) is the episcopal conference and central oversight and leadership body of the Catholic Church in the United States which, in turn, is overseen, governed, and directed by Defendant Holy See. The Catholic Church in the United States is part of the worldwide Roman Catholic Church overseen by Defendant Holy See in Rome. With Catholicism making up 20.8% of the United States population as of 2018, it is the largest religious denomination in the United States of America and the second largest religious group. The United States has the fourth largest Catholic

population in the world after Brazil, Mexico and the Philippines, the largest Catholic minority

population, and the largest English-speaking Catholic population.

30.     Founded in 1966 as the joint National Conference of Catholic Bishops and the

United States Catholic Conference, Defendant USCCB is composed of all active and retired

members of the Catholic hierarchy (*i.e.*, diocesan, coadjutor, and auxiliary bishops and the

ordinary of the Personal Ordinariate of the Chair of Saint Peter) in the United States and the

Territory of the U.S. Virgin Islands. In the Commonwealth of Puerto Rico, the bishops in the six

dioceses form their own episcopal conference, the Puerto Rican Episcopal Conference. The

bishops in U.S. insular areas in the Pacific Ocean – the Commonwealth of the Northern Mariana

Islands, the Territory of American Samoa, and the Territory of Guam – are members of the

Episcopal Conference of the Pacific. Defendant USCCB adopted its current name in July 2001.

Defendant USCCB is based in Washington, D.C. As with all bishops' conferences, certain

decisions and acts of the USCCB must (and do) receive the *recognitio*, or approval of the Roman

dicasteries, which are subject to the immediate and absolute authority of Defendant Holy See.

Defendant USCCB, a corporation organized under the laws of Washington, D.C., may be served

with Summons and a copy of this Class Action Complaint by serving any officer or its General

Counsel at 3211 4th Street NE, Washington, D.C. 20017, its principal place of business.

31.     Defendant Holy See, in its Capacity as a Foreign State (State of the Vatican City),

and in its Capacity as an Unincorporated Association and Head of an International Religious

Organization (Holy See) is the ecclesiastical, governmental, and administrative ruler of the

Roman Catholic Church, including the Roman Catholic Church in the United States, the

Enterprise, and Defendant USCCB. Defendant Holy See is the sovereign entity ruling Vatican

City. The pope is the head of state and directs the Roman Curia, a collection of administrative

units governing different ecclesial functions such as religious life, evangelization, and church

14

doctrine. Curial officials are cardinals, bishops, and priests directly employed at the Vatican in the different administrative units.

32.     Defendant Holy See comprises the authority, jurisdiction and sovereignty vested in the Pope and his delegated advisors to direct the activities of the worldwide Roman Catholic Church, including the Roman Catholic Church in America. Defendant Holy See has absolute and unqualified power and control over the Roman Catholic Church in the United States, including absolute and unqualified power and control over every Catholic Church archdiocese, diocese, school, its Clergy employees, and other of Defendants' personnel, members, employees, agents, and representatives. Defendant Holy See exercises certain powers and engages in certain activities peculiar to sovereigns. Defendant Holy See also exercises powers, and engages in activities, including commercial activities, that are not peculiar to sovereigns, but rather, are exercised and engaged in by private actors, including unincorporated associations and headquarters of international religious organizations.

33.     Defendant Holy See, which occupies its own sovereign territory located within the city of Rome, Italy, is a unique entity. It enters into treaties and conventions with other foreign states, including the *Universal Declaration of Human Rights* and the *Convention on the Rights of the Child*, maintains diplomatic relations with 176 sovereign states, including the United States, and has permanent observer status in the United Nations. At the same time, and wholly distinct and separate from its role and activities as a sovereign, it is an unincorporated association and head of the worldwide Roman Catholic Church and its Clergy.

34.     Defendant Holy See engages in commercial activity in the District of Columbia, throughout the United States, and worldwide. Defendant Holy See buys and sells real and personal property, and purchases and supplies goods and services. Defendant Holy See is supported by the contributions of money (including tithes), real property, and personal property by

15

Catholic Church parishioners, which are received as part of its regular course of commercial conduct in the United States. In exchange, Defendant Holy See, directs, supervises, supports, promotes, engages, and provides religious and pastoral directives and guidance, education, and counseling services to the worldwide Roman Catholic Church, including the Catholic Church in the United States, directly and/or through the Clergy, its employees, and its agents and representatives (including, without limitation, the Enterprise and Defendant USCCB).

35.    Defendant Holy See creates, organizes, divides, and realigns dioceses, archdioceses and ecclesiastical provinces throughout the worldwide Roman Catholic Church, including the Catholic Church in the United States. It also names bishops to lead the dioceses and transfers them between different dioceses or religious offices within the Holy See. Defendant Holy See dictates the minimum requirements for ordination as a priest or bishop, and gives final approval to the creation, division, and suppression of provinces of religious orders.

36.    Defendant Holy See directs and mandates the Clergy's morals and standards of conduct. Defendant Holy See creates, appoints, assigns, reassigns, and retires all Clergy. It also approves the elections of the heads of Catholic religious orders and, through its agents and representatives (including, without limitation, the Enterprise and Defendant USCCB), Defendant Holy See exercises its power to directly assign, reassign, and remove Clergy from their positions. All Clergy vow to respect and obey Defendant Holy See. For example, when a priest is ordained, he stands before his consecrators and the congregation and pledges his obedience and loyalty to the supreme Roman Catholic pontiff, Defendant Holy See.

37.    Defendant Holy See is responsible for the work and discipline of the Clergy. As such, Defendant Holy See, among other things, requires bishops to regularly file reports regarding the status of, and any problems with, the Clergy. Defendant Holy See promulgates and enforces the Catholic Church internal laws and regulations regarding the education, training,

16

standards of conduct, and discipline of the Clergy and all others who serve in the internal governance, administrative, judicial, educational, and pastoral operations of the worldwide Roman Catholic Church, including the Catholic Church in the United States.

38.     No Clergy may be removed from service or a position of leadership without the approval of Defendant Holy See, nor can any Clergy remain in service or a position of leadership over the objection of Defendant Holy See. Defendant Holy See is directly and absolutely responsible for removing cardinals, archbishops, and bishops from service and/or making them ineligible for positions of leadership in the various divisions and offices of the Roman Catholic Church, including the Catholic Church in the United States, by issuing instructions, mandates, and dictates in and/or directed to the United States. Defendant Holy See has the ultimate authority to approve or disapprove the settlement of legal claims against the Clergy for child rape and sexual abuse.

39.     Defendant Holy See is not a party to any international service of process treaty. Accordingly, Defendant Holy See may be served with Summons and a copy of this Class Action Complaint by delivering copies of the Complaint, the Summons, a 22 C.F.R. § 93.2 Notice of Suit, and the Foreign Sovereign Immunities Act, in both English and in Latin, to the Clerk of the Court, requesting the Clerk to send such documents, via a form of mail requiring a signed receipt, to Holy See c/o Most Rev. Paul Gallagher, Secretary for Relations with States, Section for Relations with States, Apostolic Palace, Vatican City State 00120.

## FACTS

I.     **A brief history of child sexual abuse by Catholic Clergy in the United States.**

40.     Cases of child rape and sexual abuse by Catholic Clergy in the 20th and 21st centuries are widespread and have led to numerous allegations, investigations, trials, and convictions, as well as revelations about decades of attempts by Defendants to cover up reported

17

incidents. The abused children include boys and girls, some as young as 3 years old, with the majority between the ages of 11 and 14. Many cases involve allegations against Clergy for decades of abuse; such allegations were frequently made by adults or older youth years after the abuse occurred. Cases also have also been brought against members of the Catholic Church hierarchy—including Defendants—for covering up sex abuse allegations and moving abusive Clergy from parish to parish where the abuse continued.

41.     Child sexual abuse committed by the Catholic Clergy has been going on for centuries. For example, in 306 A.D., the Council of Elvira in Spain passed the first formal legislation condemning child sexual abuse by the Clergy, including sexual abuse of boys.

42.     In the 11th century, Fr. Peter Damien wrote the Book of Gomorrah, which called for the punishment of Clergy who sexually molested and abused children, particularly boys. A copy of the book was presented to Defendant Holy See.

43.     Defendant Holy See's knowledge of Clergy abuse and its duty to monitor the Clergy and report sexual abuse first came into focus in the early 20th century when, in 1917, the Curia completed a decade-long codification of church law into the 1917 Code of Canon Law. Pope Paul VI later updated the canon to the new 1983 Code. The 1917 Code made "adultery, debauchery, bestiality, sodomy, pandering, [and] incest" ecclesial crimes. The 1917 Code specifically made it a crime for Clergy to have sexual relations or relationships with children under the age of sixteen. It also mandated, without reservation, the suspension of guilty clerics and removal from any office, and "in more serious cases," deposition. The 1983 Code goes even further, expressly forbidding the sexual abuse of children by the Clergy and directing that "civil laws to which the law of the Church yields are to be observed in canon law with the same effects," which requires both laity and clergy to report civil crimes to civil authorities as a matter

of canon law. These provisions alone demonstrate that Defendant Holy See was well-aware of the centuries-old practice of child rape and sexual abuse committed by the Catholic Clergy.

44.     In the late 1940s, American Fr. Gerald Fitzgerald founded the Congregation of the Servants of the Paraclete, a religious order that treats Catholic Clergy struggling with personal difficulties, such as substance abuse and sexual misconduct. In a series of letters and reports to high-ranking Catholic leaders starting in the 1950s, Fitzgerald warned of substantial problems with pedophile priests. He wrote, for example, "[sexual abuse] offenders were unlikely to change and should not be returned to ministry." He discussed the problem with Pope Paul VI (1963 – 1978) and "in correspondence with several bishops."

45.     In March 1962, Defendant Holy See privately circulated the *Crimen sollicitationis*, a document containing a set of procedural norms for dealing with the solicitation of sex in confession, Clergy sex with minors, homosexual relations, and bestiality. This document, which is an official legislative text, issued by the Congregation of the Holy Office and specifically approved by Pope John XXIII, imposed the highest  level of secrecy on handling Clergy sexual abuse matters and on the document itself. It reflects Defendant Holy See's longstanding policies and directives regarding Clergy sexual abuse. This secret document was first discovered and made public in July 2003 by news media in the United States and throughout the world. It requires bishops in the United States, including the District of Columbia, not to report child sexual abuse committed by Clergy to criminal or civil authorities even though the failure and refusal to do so is a criminal offense throughout the United States. At all relevant times, and as part of both its course of commercial conduct and particular commercial transactions and acts in the United States, Defendant Holy See directed (and continues to direct) bishops in the United States (*i.e.*, Defendant USCCB) to conceal from its parishioners and the general public its Clergy's sexual abuse of children in order to avoid public scandal, perpetuate

19

its Christian public image, and ensure the continued receipt of funds from its parishioners and other financial contributors. Defendant USCCB has carried out (and continues to carry out) Defendant Holy See's directives—all in furtherance of Defendants' commercial activities in the United States.

46.     Although Catholic bishops sent sexually abusive priests to facilities, such as those operated by the Servants of the Paraclete since the 1950s, there was scant public discussion of the problem until the mid-1960s; the issue was swept under the rug. Even then, most of the discussion was by and between the Catholic Church hierarchy—including Defendants—with little or no coverage in the media. A public discussion of the sexual abuse of minors by Catholic Clergy finally took place at a National Association for Pastoral Renewal meeting held at the University of Notre Dame in 1967. All U.S. Catholic bishops were invited.

47.     Thereafter, various local and regional discussions of the problem were held by Catholic bishops, including Defendant USCCB. However, it was not until the 1980s that discussion of sexual abuse by Catholic Clergy began to be covered as a phenomenon in the U.S. news media. According to the Catholic News Service, public awareness of the sexual abuse of children by the Catholic Clergy in the United States began in the late 1970s and the 1980s as an outgrowth of the growing awareness of the overall physical abuse of children in society.

48.     In September 1983, the *National Catholic Reporter* published an article on the topic. The subject gained wider national notoriety in October 1985 when Louisiana priest Gilbert Gauthe pleaded guilty to eleven counts of molesting boys. After the coverage of Gauthe's crimes subsided, the issue faded to the fringes of public attention until the mid-1990s, when it was again brought to national attention after numerous books on the topic were published.

49.     By the 1990s, the child sexual abuse cases began receiving significant media and public attention in some countries, especially in Canada, the United States, Australia and,

through a series of television documentaries such as *Suffer The Children* Ireland. A critical investigation by *The Boston Globe* in 2002 led to widespread media coverage of the issue in the United States, later dramatized in the motion picture *Spotlight*. Since then, widespread Clergy abuse has been exposed in Europe, Australia, and Chile.

50.     From 2001 to 2010, Defendant Holy See considered sex abuse allegations involving about 3,000 priests dating back fifty years, reflecting worldwide patterns of long-term abuse, as well as the Catholic Church hierarchy's pattern of regularly covering up such abuse. Diocesan officials and academics knowledgeable about the Catholic Church know that child sexual abuse by Catholic Clergy is generally not discussed, and thus, is difficult to measure.

51.     After the 2002 revelation by *The Boston Globe* that cases of abuse were widespread in the Catholic Church in Massachusetts and elsewhere, *The Dallas Morning News* conducted a year-long investigation. It reported in 2004 that even after these revelations and public outcry, the Catholic Church had moved allegedly abusive priests out of the countries where they had been accused, only to re-assign them to "settings that bring them into contact with children, despite church claims to the contrary." The investigation found that nearly half of 200 cases "involved clergy who tried to elude law enforcement."

52.     In a 2001 apology, Pope John Paul II called sexual abuse within the Church "a profound contradiction of the teaching and witness of Jesus Christ." Pope Benedict XVI apologized, met with victims, and spoke of his "shame" at the evil of abuse, calling for perpetrators to be brought to justice, and denouncing mishandling by church authorities.

53.     In 2003, Archbishop Timothy M. Dolan of the Catholic Archdiocese of Milwaukee authorized payments of as much as $20,000 to sexually abusive priests to convince them to leave the priesthood.

54.     According to a 2004 research study by the John Jay College of Criminal Justice

for Defendant USCCB (the "*Report*"), 4,392 Catholic priests and deacons in active ministry between 1950 and 2002 have been plausibly accused (neither withdrawn nor disproven) of under-age sexual abuse by 10,667 individuals. Estimating the number of priests and deacons active in the same period at 110,000, the *Report* concluded that approximately 4% have faced such allegations. The *Report* noted that "[i]t is impossible to determine from our surveys what percent of all actual cases of abuse that occurred between 1950 and 2002 have been reported to the Church and are therefore in our dataset." The *Report* also found that:

- Approximately 81% of the victims were male.

- Female victims of sexual abuse by Catholic priests tended to be younger than the males. Data showed that the number and proportion of sexual misconduct directed at girls under 8 years old was higher than that directed at boys of the same age.

- 22.6% of the victims were age 10 or younger, 51% were between the ages of 11 and 14, and 27% were between the ages to 15 to 17 years.

- A substantial number (almost 2000) of very young children were victimized by priests.

- 9,281 victim surveys had information about an investigation. In 6,696 (72%) cases, an investigation of the allegation was carried out. Of these, 4,570 (80%) were substantiated; 1,028 (18%) were unsubstantiated; 83 (1.5%) were found to be false. In 56 cases, priests were reported to deny the allegations.

- In approximately 20% of the allegations, the allegedly abusive priest was deceased or inactive at the time the allegation was first made, and typically no investigation was conducted in these circumstances.

- In 38.4% of the allegations, the abuse was alleged to have occurred within a single year, in 21.8% the alleged abuse lasted more than a year, but less than 2 years, in 28% between 2 and 4 years, in 10.2% between 5 and 9 years and, in under 1%, 10 or more years.

The 4,392 accused priests amounted to approximately 4% of the 109,694 priests in active ministry during that time. Of these 4,392 priests, approximately:

- 56% had one reported allegation against them; 27% had two or three allegations against them; nearly 14% had four to nine allegations against them; and 3% (149 priests) had 10 or more allegations against them. These 149 priests were responsible for almost 3,000 victims, or 27% of the allegations.

- The allegations were substantiated for 1,872 priests and unsubstantiated for 824 priests. The allegations were considered credible for 1,671 priests and not credible for 345 priests.

- 50% of the priests were 35 years of age or younger at the time of the first instance of alleged abuse.

- Almost 70% of the allegedly abusive priests were ordained before 1970.

- Fewer than 7% were reported to have themselves been victims of physical, sexual or emotional abuse as children. Although 19% had alcohol or substance abuse problems, 9% were reported to have used drugs or alcohol during the instances of abuse.

55.     The *Report* also found that "[l]ike in the general population, child sex abuse in the Catholic Church appears to be committed by men close to the children they allegedly abuse." According to the study, "many (abusers) appear to use grooming tactics to entice children into complying with the abuse, and the abuse occurs in the home of the alleged abuser or victim." The *Report* characterized these enticements as actions such as buying the minor gifts, letting the victim drive a car, and taking youths to sporting events. The most frequent context for abuse was a social event and many priests socialized with the families of victims. Abuses occurred in a variety of places with the most common being the residence of the priest.

56.     Many of the reported acts of sexual abuse involved fondling or unspecified abuse. There were allegations of forced acts of oral sex and intercourse. Detailed information on the nature of the abuse was not reported for 26.6% of the reported allegations. Approximately 27.3% of the allegations involved the cleric performing oral sex on the victim; 25.1% of the allegations involved penile penetration or attempted penetration.

57.     The *Report* further noted that although there were reported acts of sexual abuse of minors in every year, the incidence of reported abuse increased markedly in the 1960s and 1970s. There was, for example, a more than six-fold increase in the number of reported acts of abuse of males aged 11 to 17 between the 1950s and the 1970s. After peaking in the 1970s, the number of incidents in the report decreased through the 1980s and 1990s even more sharply than

the incidence rate had increased in the 1960s and 1970s. Contributing factors to the abuse were "poor screening and training of priests."

58.     The *Report* also noted the Catholic Church hierarchy's failure to grasp the seriousness of the problem, overemphasis on the need to avoid a scandal, use of unqualified treatment centers for Clergy removed for rehabilitation, a misguided willingness by bishops to forgive sexual misconduct as a moral failing and not treat it a crime, allowance of recidivism upon reassignment of abusing priests, and insufficient accountability of the hierarchy for inaction. The *Report* has since been updated through 2010.

59.     The Augustin Cardinal Bea, S.J., who specializes in abuse counseling and is considered an expert on clerical abuse, stated that "approximately 4% of priests during the past half century (and mostly in the 1960s and 1970s) have had a sexual experience with a minor." In fact, the United States is the country with the highest number of reported Catholic Church sex abuse cases.

60.     For example, as recently as 2011, Fr. Curtis Wehmeyer was allowed to work as a priest in Minnesota despite many people reporting concern about his sexual compulsion and suspicious behavior with boys. Fr. Wehmeyer was employed as a priest without proper background checks. He was later convicted of sexually abusing two boys. After his arrest, numerous complaints were lodged that the responsible Clergy were more concerned with how to spin the story in a favorable light than in helping victims.

61.     On May 13, 2017, Pope Francis acknowledged that the Vatican had a 2,000-case backlog of sex abuse cases.

62.     Pope Francis began 2018 by accusing victims of fabricating allegations, but by April apologized for his "tragic error," and by August expressed "shame and sorrow" for the tragic history of Clergy sexual abuse of children, but the situation has not substantively changed.

24

63.     In July 2018, Cardinal Theodore McCarrick resigned from the College of Cardinals (the first Cardinal to do so since 1927), following allegations of child sexual abuse and attempted homosexual rape at a seaside villa.

64.     In August 2018, Archbishop Carlo Maria Viganò, a former senior Vatican official and diplomat, claimed the pope knew as early as 2013 about allegations that the former archbishop of Washington, ex-Cardinal Theodore McCarrick, had been sexually active with seminarians and that Pope Benedict XVI had privately disciplined him over the charges. Archbishop Viganò said that Pope Francis had ignored then-Cardinal McCarrick's record and rehabilitated him as a powerful figure in the United States Catholic Church.

65.     In August 2018, a Pennsylvania grand jury issued a searing report that bishops and other leaders of the Catholic Church in Pennsylvania covered up child sexual abuse by more than 300 priests against over 1000 victims over a period of 70 years, persuading victims not to report the abuse and law enforcement not to investigate it. Since then, attorneys general in at least a dozen states have opened investigations into whether their local dioceses engaged in cover-ups of Clergy who sexually abused minors.

66.     On October 9, 2018, the United States Department of Justice ("DOJ") sent a sweeping request to Defendant USCCB that every Roman Catholic diocese in the United States preserve all documents related to the handling of child sexual abuse. The DOJ also asked Defendant USCCB to retain its files on a broad array of internal matters, including sexual abuse investigations and the transfer of priests across state or international borders, or to treatment centers. The DOJ's request includes documents contained in "secret archives" — the confidential files kept by each diocese. On October 23, 2018, Defendant USCCB sent the DOJ letter to all United States dioceses.

67.     On October 12, 2018, Pope Francis accepted the resignation of Cardinal Donald

Wuerl, the archbishop of Washington, D.C., for his handling of clerical sex abuse. Cardinal

Wuerl was bishop of Pittsburgh for 18 years before coming to Washington in 2006 is accused by

Catholics for not doing enough to root out Clergy abuse. In a highly unusual step, as the pope

accepted the resignation of Cardinal Wuerl, the pope also wrote a letter praising Cardinal

Wuerl's "nobility" in choosing to step down rather than defend his record. The pope's letter

further angered critics of the Catholic Church's response to Clergy sexual abuse say the pontiff

fails to appreciate the gravity of the crisis. Terence McKiernan of BishopAccountability.org, an

organization that tracks abuse cases, said the letter "sends a clear message that for Pope Francis,

Cardinal Wuerl is more important than the children he put in harm's way."

68.     On November 12, 2018, at its annual meeting in Baltimore, Maryland,

Defendant USCCB was prepared to vote on reforms addressing Clergy child sexual abuse. At

the eleventh hour, however, Defendant Holy See ordered Defendant USCCB not to take any

action on the proposed reforms, but rather, wait until after a global summit on the issue

planned for February 2019—thereby kicking the can down the road again.

## II.     Defendants have repeatedly failed and refused to properly address Clergy child sexual abuse.

69.     Historically, Defendants have addressed child sexual abuse as an internal matter.

Abusive Clergy were sanctioned under canon law and sometimes received treatment from

specialized Catholic service agencies, but relatively few of them were reported to civil

authorities. Bishops have routinely moved abusive Clergy from parish to parish where they still

had personal contact with children, rather than seeking to permanently remove them from the

priesthood. Child sexual abuse has been institutionalized, routinized, and tolerated by the

Catholic Church hierarchy, including Defendants, for decades to the point that it has operated as

a criminal syndicate. Defendants are guilty of a grave moral failure for allowing the massive and

rampant sexual abuse of children by Catholic Clergy. In fact, in response to Defendants' failure to report child sexual abuse to law enforcement, lawmakers in multiple states have moved to change their laws to make reporting of abuse to law enforcement compulsory.

70.    Defendant Holy See has been especially slow to react. For example, in April 2003, the Pontifical Academy for Life organized a three-day conference, entitled "Abuse of Children and Young People by Catholic Priests and Religious," where eight non-Catholic psychiatric experts spoke nearly all Vatican dicasteries' representatives. The panel of experts identified the following factors contributing to the sexual abuse problem:

- Failure by the hierarchy to grasp the seriousness of the problem.
- Overemphasis on the need to avoid a scandal.
- Use of unqualified treatment centers.
- Misguided willingness to forgive.
- Insufficient accountability.

Yet Defendant Holy See took no affirmative action to address the issue.

71.    Thereafter, in July 2010, Defendant Holy See issued a document doubling the length of time after a victim's 18th birthday that abusive Clergy can be tried in a church court and streamlining the processes for removing pedophile priests. However, the new rules are less strict than those already in place in the United States and lack the clarity that pedophilia is a civil offense. Again, no decisive action to protect children from pedophile priests.

72.    In May 2011, Defendant Holy See published new guidelines dealing with Clergy sexual abuse cases. The guidelines instruct the bishops—including Defendant USCCB—and heads of Catholic religious orders worldwide to develop "clear and coordinated" procedures for dealing with sexual abuse allegations. The guidelines further instruct the bishops—including Defendant USCCB—to cooperate with the police and respect the relevant local laws in investigating and reporting allegations of Clergy sexual abuse to the civic authorities, although the guidelines do not make such reporting mandatory. The guidelines also reinforce the exclusive

27

authority of the bishops—including the USCCB—to deal with Clergy sexual abuse cases. The guidelines, however, are perfunctory and insufficient; they do not have the status of church law and do not provide any specific enforcement mechanisms.

73.     While Defendants claim to have addressed the issue, the truth is that as of at least 2006, there were approximately 5,000 abusive Catholic Clergy in the United States, only 150 of whom had been successfully prosecuted. Defendants and other Church leaders who enabled child sexual abuse were too frequently careless about their own accountability and the accountability of perpetrators. Some critics of the Catholic Church, such as Patrick Wall, attribute this to Defendants' lack of cooperation. In California, for example, the archdiocese sought to block the disclosure of confidential counseling records on two priests, arguing that such action would violate their First Amendment right on religious protection.

74.     In September 2010, Pope Benedict XVI lamented that the Catholic Church had not been vigilant enough or quick enough in responding to the problem of Clergy sexual abuse. After Pope Benedict's resignation in 2013, he was criticized by Survivors Network of those Abused by Priests (SNAP) for allegedly protecting the Church's reputation "over the safety of children." Representatives from the Center for Constitutional Rights (at the time engaged in an International Criminal Court case against Pope Benedict in which they were acting for SNAP), alleged that Pope Benedict had been directly involved in covering up some of the crimes.

75.     Defendants have historically failed to act quickly and decisively to remove, laicize, and report Clergy accused of sexual misconduct. Cardinal Roger Mahony of the Archdiocese of Los Angeles, said: "We have said repeatedly that ... our understanding of this problem and the way it's dealt with today evolved, and that in those years ago, decades ago, people didn't realize how serious this was, and so, rather than pulling people out of ministry directly and fully, they were moved."

76.     One early opponent of the treatment of sexually abusive priests was Fr. Gerald Fitzgerald, the founder of The Congregation of the Servants of the Paraclete. Although Fr. Fitzgerald started the Servants of the Paraclete to assist Clergy struggling with alcohol and substance abuse problems, he soon began counseling Clergy who had sexually abused minors. Initially, Fr. Fitzgerald attempted to treat such Clergy using the same spiritual methods he used with his other guests. But as he grew convinced of the futility of treating sexually abusive Clergy, Fr. Fitzgerald came to vehemently oppose the return of sexual abusers to their duties. He wrote regularly to bishops in the United States and to Vatican officials, including the Pope, of his opinion that many Clergy sexual abusers could not be cured and should be laicizied immediately.

77.     Defendants also have historically operated under a veil of secrecy regarding Clergy sexual abusers. As reported by *The Boston Globe,* several bishops have facilitated compensation payments to victims on condition that their allegations remained secret. According to *The Boston Globe*, the Archdiocese of Boston secretly settled child sexual abuse claims against at least 70 Clergy from 1992 to 2002. This practice is consistent with the Catholic Church's worldwide game plan to cover up Clergy child sexual abuse. For example, in November 2009, the Irish Commission to Inquire into Child Abuse reported its findings:

> The Dublin Archdiocese's pre-occupations in dealing with cases of child sexual abuse, at least until the mid-1990s, were the maintenance of secrecy, the avoidance of scandal, the protection of the reputation of the Church, and the preservation of its assets. All other considerations, including the welfare of children and justice for victims, were subordinated to these priorities. The Archdiocese did not implement its own canon law rules and did its best to avoid any application of the law of the State.

78.     In April 2010, a lawsuit was filed in Milwaukee federal court by an anonymous "John Doe 16" against Defendant Holy See and Pope Benedict XVI. The plaintiff accused the Pope and others of covering up Clergy sexual abuse cases to avoid scandal to the detriment of the concerned children. In February 2011, two German lawyers initiated charges against Pope

Benedict XVI at the International Criminal Court, alleging the Pope (aka Joseph Ratzinger), as head of the Congregation for the Doctrine of the Faith, covered up Clergy sexual abuse of children and youths to protect the perpetrators.

79.     Internal division within the Catholic Church over this issue finally became public. A Vatican spokesman stated "When individual institutions of national churches are implicated, that does not regard the competence of the Holy See. ... The competence of the Holy See is at the level of the Holy See." But citing canons 331 and 333 of the 1983 Code of Canon Law, James Carroll of *The Boston Globe* asserted that "[o]n the question of how far papal authority extends, the canon law of the Catholic Church could not be clearer," and the Holy See's denial of competency contravenes canon law. Canon 331 states that "The vicar of Christ ... possesses full, immediate, and universal ordinary power in the Church, which he is always able to exercise freely," and canon 333 states that "... by virtue of his office, the Roman pontiff not only possesses power over the universal church, but also obtains the primacy of ordinary power over all particular churches and groups of them."

80.     Silvano Tomasi, Defendant Holy See's ambassador to the U.N. at the time, stated—quite incredibly—that the Vatican is not responsible for abusive Clergy because "Clergy are citizens of their own states, and they fall under the jurisdiction of their own country." But a United Nations report[4] disagreed, claiming that since Clergy are "bound by obedience to the

---

[4]     In early 2014, the United Nations Committee on the Rights of the Child issued a report asserting that the Pope and the Catholic Church have worked hard to protect their reputations, rather than protect children. The Committee called for the immediate removal of all known or suspected Clergy child molesters, opening up the archives on abusers and bishops who covered up such abuse, and instances of abuse reported to law enforcement agencies for investigation and prosecution. The Committee issued the following statement:

> The committee is gravely concerned that the Holy See has not acknowledged the extent of the crimes committed, has not taken the necessary measures to address cases of child sexual abuse and to protect children, and has adopted policies and

pope" under canon law, Defendant Holy See, in fact, is accountable. The report also urged the Vatican to insist that Clergy and bishops involve the police in all abuse reports and end a "code of silence" leading to whistleblowers being "ostracized, demoted and fired."

81. Placing cases under the competence of Defendant Holy See's Congregation for the Doctrine of the Faith also makes the process more secretive and lengthens the time required to address the allegations. For example, in his biography of Pope John Paul II, David Yallop asserts that the backlog of referrals to the Congregation for the Doctrine of the Faith for action against sexually abusive Clergy is so large that it takes 18 months to merely get a reply.

82. Vatican officials themselves have expressed concern that the Catholic Church's insistence on confidentiality in its treatment of Clergy sexual abuse cases effectively operates as a ban on reporting serious accusations to civil and criminal authorities. Early in 2010, Cardinal Claudio Hummes, the head of the Congregation for Clergy, finally stated that instances of Clergy sexual abuse were "criminal facts," as well as serious sins, requiring co-operation with the civil justice system. But nothing substantively happened to address the issue. Italian academic Lucetta Scaraffia described the Catholic Church's conspiracy to hide Clergy sexual abuse as *omerta*, the Mafia code of silence, stating: "We can hypothesize that a greater female presence, not at a

---

practices which have led to the continuation of the abuse by, and the impunity of, the perpetrators.

Due to a code of silence imposed on all members of the clergy under penalty of excommunication, cases of child sexual abuse have hardly ever been reported to the law enforcement authorities in the countries where such crimes occurred.

The Committee also enumerated several major findings, including that pedophile Clergy were sent to new parishes or other countries without police being informed, the Vatican never insisted on bishops reporting child sexual abuse to police, and known abusers still have access to children.

subordinate level, would have been able to rip the veil of masculine secrecy that in the past often covered the denunciation of these misdeeds with silence."

83.    Moreover, the 1962 *Crimen sollicitationis* issued by Defendant Holy See's Holy Office (now called the Congregation for the Doctrine of the Faith) codified the procedures to be followed in cases of Clergy who used the sacrament of Penance to make sexual advances to penitents; to wit, keep all allegations of sexual abuse secret. This document alone demonstrates Defendants' systematic conspiracy to conceal such crimes.

84.    In 2013, a group calling itself Catholic Whistleblowers launched a public campaign to encourage improvement in implementing zero-tolerance policies on child sexual abuse by Catholic Clergy. The group said that "vigilance is necessary because some bishops are violating the ... policies, and abusive clergy (who now number 6,275, according to the bishops' count of those accusations that they deem credible) still have access to children." According to abuse victim, Mary Dispenza:

> It is easy to think that when we talk about the crisis of child rape and abuse that we are talking about the past – and the Catholic Church would have us believe that this most tragic era in church history is over. It is not. It lives on today. Pedophiles are still in the priesthood. Coverups of their crimes are happening now, and bishops in many cases are continuing to refuse to turn information over to the criminal justice system. Cases are stalled and cannot go forward because the church has such power to stop them. Children are still being harmed and victims cannot heal.

"*Opinion: Pope Francis must finally root out child abuse,*" CNN.com (Feb. 6, 2014).

85.    While Defendants claim to have properly addressed child sexual abuse by the Clergy, it's only lip service. In truth, they have hardened their defenses, allowed the abuse to continue, systematically and consistently covered it up, refused to address the issue, and refused to report such abuse and the abusing Clergy to the proper authorities—all in the name of shielding Defendants and the Catholic Church in the United States from scandal and protecting their commercial activities and financial support. Yet thousands of victims across the United

States continue to report abuse. And now Defendant Holy See's last minute directive to

Defendant USCCB to stand down on considering Clergy child sexual abuse reforms.

86.     Clergy child sexual abuse crimes occurred in the past, are occurring now, and will

continue in the future unless Pope Francis and Defendants act decisively to ensure that child

safety has a higher priority than protecting abusive Clergy and the image of the Catholic Church.

They have not acted decisively so far. Defendants have failed and refused to properly address

Clergy child sexual abuse (and continue to do so). It is time for the guilty Clergy at all levels to

be identified and permanently rooted out of the Catholic Church in the United States, the sexual

abuse victims properly compensated for their injuries and damages, and comprehensive protocols

and procedures instituted to compensate future victims and protect children and their families

from abusive Clergy going forward. This case has resulted.

## DEFENDANTS' PATTERN OF UNLAWFUL ACTIVITY UNDER 18 U.S.C. § 1961, *et seq.*:  INTERSTATE AND INTERNATIONAL MAIL AND WIRE FRAUD

87.     The preceding factual statements and allegations are incorporated by reference.

88.     As the spiritual leaders of Plaintiffs and Class Members in positions of authority

and power, Defendants knew that Plaintiffs and Class Members put their faith, trust, and

confidence in them (and the Clergy). Nevertheless, Defendants intentionally devised, engaged in,

condoned and/or ratified the above-referenced open-ended and unlawful schemes to defraud and

cheat Plaintiffs and Class Members.

89.     Defendants' above-described unlawful and intentional schemes, wrongful actions,

inaction and/or omissions wrongfully cheated Plaintiffs and Class Members and violated all

concepts of moral uprightness, fundamental honesty, fair play, and right dealing by and between

members of society. Since at least 1940 (and possibly earlier) Defendants have utilized the

Enterprise to engage in unlawful and intentional schemes to (i) defraud Plaintiffs and Class

Members via misrepresentations and omissions (on which Plaintiffs, Class Members,

Defendants, the Clergy, and/or other third parties justifiably relied), and (ii) defraud Plaintiffs

and Class Members by cheating them via means of false or fraudulent pretenses—first subjecting

Plaintiffs and Class Members to Clergy sexual abuse, then covering up and concealing the sexual

abuse so as to maintain Defendants' reputations and maintain and expand their commercial

operations in the United States whereby Defendants and the Enterprise obtained (and continue to

obtain) money, funds, credits, assets, and/or other property, and, in the process, cheating and

defrauding Plaintiffs and Class members out of their childhood, youth, innocence, virginity,

families, jobs, finances, assets—in short, their lives. Defendants carried out these schemes to

defraud through the Enterprise using the United States and international mail in violation of 18

U.S.C. § 1341. Defendants also carried out these schemes to defraud through the Enterprise

using interstate and international telephone calls and electronic communications in violation of

18 U.S.C. § 1343.

90.     Defendants' schemes to defraud involved (and continue to involve) means of false

or fraudulent pretenses and/or fraudulent and intentionally misleading representations and

omissions, including, *inter alia*, (i) Defendants (and the Clergy) secretly misrepresenting to

Plaintiffs and Class Members—through their words and deeds—that they were men of faith who

had Plaintiffs' and Class Members' best interests at heart, and then, knowing that Plaintiffs and

Class Members relied on their representations and put their faith and trust in the Clergy as their

spiritual leaders, took advantage of their positions of power and influence and sexually abused

Plaintiffs and Class Members, (ii) Defendants (and the Clergy) misrepresenting to Plaintiffs,

Class Members, Defendants, the Clergy, and/or other third parties—explicitly and/or

implicitly—that the wrongful sexual abuse did not occur (denial and deceit), (iii) Defendants

(and the Clergy) shifting the focus of the allegations to Plaintiffs and Class by painting them as

liars, alleging Plaintiffs and Class Members falsified the charges, or that they suffered from some

34

mental illness giving rise to their allegations of Clergy sexual abuse, and (iv) Defendants (and the Clergy) actively and fraudulently concealing the Clergy's wrongful sexual abuse by, among other things, (a) burying the charges deep within Defendants' organizations and affirmatively deciding not to publicize, properly investigate, or act on them, (b) failing and refusing to terminate, or even discipline, abusing Clergy, (c) moving the abusive Clergy from parish to parish, without warning church members or the general public, thereby further facilitating their predatory practices, failing and refusing to report the abusive Clergy to law enforcement or other responsible authorities as required by law, and even promoting abusive Clergy, and (iv) using all available means to look the other way, deny, obstruct the investigation of, and conceal Clergy sexual abuse. Defendants' wrongful acts are open-ended, ongoing, and continuous.

91.     As a direct and proximate result of Defendants' (and the Clergy's) above-referenced wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence, *inter alia*, (i) Plaintiffs and Class Members have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages to themselves, their businesses and/or their property, (ii) Defendants have maintained (and will continue to maintain) their reputations and maintained and expanded (and will continue to expand and maintain) their commercial operations in the United States whereby Defendants and the Enterprise obtained (and will continue to obtain) money, funds, credits, assets, and/or other property, and (iii) Defendants wrongfully shifted the risk, expense, and pain, and suffering of the Clergy sexual abuse to Plaintiffs and Class Members. Defendants' schemes to defraud also amounted to a cheat against Plaintiffs and Class Members and robbed them of their childhood, youth, innocence, virginity, families, jobs, finances, assets—in short, their lives. Defendants intentionally engaged (and continue to engage) in these wrongful actions, inaction, omissions,

cover-up, deception, and concealment, obstructive behavior regarding investigations, and

conspiracy of silence to their financial and reputational benefit, and to Plaintiffs' and Class

Members' personal, mental, psychological, and financial detriment.

92.     Defendants' above-described unlawful and intentional schemes, actions, inaction,

omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations,

and conspiracy of silence unfairly betrayed the confidences Plaintiffs and Class Members placed

in Defendants. Defendants' above-described unlawful and intentional schemes to defraud and

cheat, actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior

regarding investigations, and conspiracy of silence were (and continue to be) a consistent,

regular and dominant part of the manner in which they participated in, and conducted their day-

to-day dealings with, Plaintiffs, Class Members, the Clergy, the Enterprise, each other, and other

third parties—and continue to do so.

93.     Defendants intentionally devised, instigated, perpetrated, executed, condoned

and/or ratified the above-described schemes to defraud and cheat by means of false or fraudulent

pretenses, and engaged in the above-described repeated and systematic interstate and

international mail and wire fraud by sending thousands (if not hundreds of thousands) of letters

and other handwritten communications via the interstate and international mails, and telephone

calls and other electronic communications via the interstate and international wires, both in

interstate and international commerce, *inter alia*, by and between themselves and Plaintiffs and

Class Members, by and between themselves, by and between themselves and the Enterprise, by

and between themselves and the Clergy, and by and between themselves and other third

parties—each of which was a separate violation of 18 U.S.C. § 1341 or 18 U.S.C. § 1343

(depending on the type of communication).

94.     Defendants used and/or caused the Enterprise to use the interstate and

international mails and wires in in interstate and international commerce to devise, engage in, condone, and/or ratify the above-described open-ended, unlawful and intentional schemes to defraud and cheat Plaintiffs and Class Members without their knowledge or approval. The dates and substance of Defendants' schemes and/or internal and external fraudulent communications, via the interstate and international mail and wires, in furtherance of the above-described schemes to defraud and cheat Plaintiffs and Class Members are in Defendants' possession, custody, and control, and await discovery. By their unlawful conduct, Defendants (i) conducted and/or participated in the affairs of the Church Enterprise in violation of 18 U.S.C. § 1962(c), and/or (ii) conspired to violate 18 U.S.C. § 1962(c) (in violation of 18 U.S.C. § 1962(d))—defrauding and cheating Plaintiffs and Class Members in the process.

95.     Defendants caused the Enterprise to engage in the above-described open-ended, unlawful, intentional and fraudulent schemes to defraud and cheat—without Plaintiffs' and Class Members' knowledge or approval—for the purpose of maintaining Defendants' reputations and maintaining and expanding their commercial operations in the United States whereby Defendants and the Enterprise obtained money, funds, credits, assets, and/or other property. Defendants' above-described unlawful and intentional schemes to defraud and cheat, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence wrongful actions, inaction and/or omissions constitute interstate and international mail and wire fraud in violation of 18 U.S.C. §§ 1341; 1343.

96.     Defendants' above-described multiple, repeated, and continuous acts of interstate and international mail and wire fraud constitute a pattern of unlawful activity under 18 U.S.C. § 1961(1); (5). Nothing in Defendants' actions demonstrates that their open-ended, unlawful, and intentional schemes to defraud and cheat, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of

silence will ever terminate but for this Court's intervention. Moreover, and independent of the duration of the schemes, Defendants' above-described unlawful and intentional schemes, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence were (and continue to be) a consistent, regular and dominant part of the manner in which they participate in, and conduct their day-to-day  dealings with, Plaintiffs, Class Members, the Clergy, the Enterprise, each other, and other third parties.

## CLASS ACTION ALLEGATIONS

97.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action against Defendants as a national class action, for themselves and all members of the following Class of similarly situated individuals in the United States and the Territory of the U.S. Virgin Islands (the "Nationwide Class"):

> All persons and if minor children, their parents or guardians on their behalf, who were sexually abused by Catholic Church cardinals, bishops, monsignors, priests, sisters, lay leaders, members of Catholic religious orders, educators, and other of Defendants' personnel, members, agents, and representatives (*i.e.*, the "Clergy"), and the legal representatives of a decedent's estate, next of kin, survivors of all Plaintiffs and Class members who committed suicide as a direct or proximate result of such Clergy sexual abuse, from 1940 to present.

98.     Excluded from the Nationwide Class are Defendants, all current and former members and employees of Defendants, Catholic Church Clergy, and the Court and its personnel.

99.     The proposed Nationwide Class consists of over five thousand geographically dispersed members, the joinder of whom in one action is impracticable. The precise number and identities of Class Members are currently unknown to Plaintiffs but are identifiable and readily ascertainable from Defendants' internal records.

100.     Defendants violated the rights of each Class Member in the same way by their and

38

the Clergy's above-described wrongful actions, inaction, omissions, cover-up, deception, and

concealment, obstructive behavior regarding investigations, and conspiracy of silence.

**101.** Certain questions of law and fact common to the proposed Nationwide Class

predominate over any questions affecting individual Class Members, including:

(i) whether Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence violated 18 U.S.C. § 1962(c) and/or (d);

(ii) whether Defendants' above-described wrongful actions constitute assault at common law;

(iii) whether Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence constitute breach of fiduciary duty at common law;

(iv) whether Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence constitute negligence/gross negligence at common law;

(v) whether Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence constitute negligence *per se* at common law;

(vi) whether Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence constitute intentional infliction of emotional distress at common law;

(vii) whether Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence constitute wrongful death at common law;

(viii) whether Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence constitute a public nuisance at common law;

(ix) whether Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence constitute conspiracy at common law;

(x) whether Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence constitute aiding and abetting at common law;

(xi)    whether Defendants should be compelled to make full restitution to Plaintiffs and Class Members under principles of equity;

(xii)   whether Defendants also are liable to Plaintiffs and Class Members for the Clergy's above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence under the doctrine of *respondeat superior*, agency theory, and/or the command responsibility doctrine;

(xiii)  whether Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence directly or proximately caused Plaintiffs and Class Members to suffer physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages;

(xiv)   whether Plaintiffs and Class Members are entitled to recover actual damages, consequential damages, compensatory damages, economic damages, punitive damages, RICO treble damages, pre- and post-judgment interest, attorneys' fees, litigation expenses, and court costs and, if so, the amount of the recovery; and

(xv)    whether Plaintiffs and Class Members are entitled to declaratory and injunctive relief, including the establishment of a medical monitoring fund for the testing, diagnosis and treatment of Plaintiffs' and Class Members' emotional, psychological, and mental health issues directly and proximately resulting from Defendants' (and the Clergy's) above-described wrongful conduct.

**102.**    Plaintiffs' claims are typical of Class Members' claims because Plaintiffs and Class Members are all victims of Clergy child sexual abuse and Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence.

**103.**    Plaintiffs and their counsel will fairly and adequately represent the interests of Class Members. Plaintiffs have no interests antagonistic to, or in conflict with, the interests of any Class Members. Plaintiffs' counsel are experienced in leading and prosecuting class actions and complex commercial litigation, including complex torts and RICO cases.

**104.**    A class action is superior to all other available methods for fairly and efficiently adjudicating Plaintiffs' and Class Members' claims. Plaintiffs and Class Members have been (and will continue to be) harmed as a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive

behavior regarding investigations, and conspiracy of silence. Litigating this case as a class action is appropriate because (i) it will avoid a multiplicity of suits and the corresponding burden on the courts and Parties, (ii) it would be virtually impossible for all Class Members to intervene as parties-plaintiff in this action, and (iii) it will provide court oversight of the claims process once Defendants' liability is adjudicated.

105.    Certification, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because the above-described common questions of law or fact predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

106.    Certification also is appropriate under FED. R. CIV. P. 23(b)(2) because Defendants have acted (or refused to act) on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or equitable relief with respect to the Class as a whole.

107.    Certification also is appropriate under FED. R. CIV. P. 23(b)(1) because the prosecution of separate actions by individual Class Members would create a risk of establishing incompatible standards of conduct for Defendants. For example, one court might decide that the challenged actions are illegal and enjoin Defendants, while another court might decide that the same actions are not illegal. Individual actions also could be dispositive of the interests of the other Class Members who are not parties to such actions, and substantially impair or impede their ability to protect their interests.

108.    Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence are applicable to the Class as a whole, for which Plaintiffs seek, *inter alia*, damages, declaratory relief, injunctive relief, and other equitable remedies.

109.    Absent a class action, Defendants will retain the benefits of their wrongdoing despite

seriously violating the law and inflicting physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages on Plaintiffs and Class Members.

## CLAIMS FOR RELIEF/ CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF 18 U.S.C. § 1962(c)

**(On Behalf of the Nationwide Class Against Both Defendants Directly and Under the Doctrine of *Respondeat Superior*, Agency Theory, and/or the Command Responsibility Doctrine)**

**110.**    The preceding factual statements and allegations are incorporated by reference.

**111.**    Plaintiffs and Class Members are "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1964(c). Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

**112.**    The Church Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) and, at all relevant times, were engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c).

**113.**    Defendants conducted and/or participated in the business and financial affairs of the Church Enterprise through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c)—to wit, the above-described multiple, repeated, and continuous acts of interstate and international mail and wire fraud in violation of 18 U.S.C. §§ 1341; 1343 used to devise, engage in, condone and/or ratify the above-described open-ended, unlawful, and intentional schemes to defraud and cheat Plaintiffs and Class Members.

**114.**    Defendants' pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(c) through the Church Enterprise directly and/or proximately caused Plaintiffs and Class Members to suffer injury to their businesses and/or property within the meaning of 18 U.S.C. § 1964(c)—to wit, Plaintiffs and Class Members were damaged (and will continue to be damaged) by Defendants engaging in the above-described repeated and systematic interstate and

international mail and wire fraud, in violation of 18 U.S.C. §§ 1341; 1343, to devise, engage in, condone and/or ratify the above-described open-ended, unlawful and intentional schemes to defraud and cheat Plaintiffs and Class Members.

115.    As a direct and proximate result of Defendants' (and the Clergy's) above-referenced wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence through the through the Church Enterprise, *inter alia*, (i) Plaintiffs and Class Members have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages to themselves, their businesses, and/or their property, (ii) Defendants maintained (and will continue to maintain) their reputations and maintained and expanded (and will continue to maintain and expand) their commercial operations in the United States whereby Defendants and the Enterprise obtained (and will continue to obtain) money, funds, credits, assets, and/or other property, and (iii) Defendants have wrongfully shifted the risk, expense, and pain, and suffering of the Clergy sexual abuse to Plaintiffs and Class Members and robbed them of their childhood, youth, innocence, virginity, families, jobs, finances, assets—in short, their lives. Defendants' schemes to defraud also amounted to a cheat against Plaintiffs and Class Members. Defendants intentionally engaged in these wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence to their financial and reputational benefit and to Plaintiffs' and Class Members' personal, mental, psychological, and financial detriment—and continue to do so.

116.    Defendants knew or recklessly should have known the above-described unlawful and intentional schemes to defraud and to cheat, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence were fraudulent, misleading and illegal, and would cause Plaintiffs and Class Members to

suffer the above-referenced damages. All of Plaintiffs' and Class Members' damages were

reasonably foreseeable by Defendants and/or anticipated as a substantial factor and a natural

consequence of their open-ended, ongoing, and continuous pattern of unlawful activity.

117.    Defendants' above-described unlawful and intentional schemes to defraud and to

cheat, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive

behavior regarding investigations, and conspiracy of silence violated (and continue to violate) 18

U.S.C. § 1962(c) by violating 18 U.S.C. §§ 1341; 1343.

## COUNT II

### VIOLATION OF 18 U.S.C. § 1962(d) BY
### CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c)

**(On Behalf of the Nationwide Class Against Both Defendants Directly and Under the Doctrine of *Respondeat Superior*, Agency Theory, and/or the Command Responsibility Doctrine)**

118.    The preceding factual statements and allegations are incorporated by reference.

119.    Plaintiffs and Class Members are "persons" within the meaning of 18 U.S.C. §§

1961(3); 1964(c). Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

120.    The Church Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§

1961(4) and 1962(c) and, at all relevant times, were engaged in, and the activities of which

affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

121.    On information and belief, Defendants conspired with other persons and/or

entities, the identities of whom are known only to Defendants at this time, within the meaning of

18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c); that is, Defendants and their co-conspirators

conspired to conduct and/or participate in the business and financial affairs of the Church

Enterprise through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B);

1961(5); and 1962(c)—to wit, the above-described open-ended, unlawful and fraudulent schemes

to defraud and cheat Plaintiffs and Class Members. Defendants and its co-conspirators

intentionally participated in a conspiracy to engage in the above-described unlawful and intentional schemes, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence to their financial and reputational benefit and to Plaintiffs' and Class Members' personal, mental, psychological, and financial detriment—and continue to do so. The members, time, and place of this complex, multi-party conspiracy are known only by Defendants at this time and await discovery.

122.     The pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(d) engaged in by Defendants and their co-conspirators directly and/or proximately caused Plaintiffs and Class Members to suffer injury to their businesses and/or property within the meaning of 18 U.S.C. § 1964(c)—to wit, Plaintiffs and Class Members were damaged (and will continue to be damaged) by Defendants conspiring to engage (and engaging) in the above-described repeated and systematic interstate and international mail and wire fraud, in violation of 18 U.S.C. §§  1341; 1343, to devise, engage in, condone and/or ratify the above-described open-ended, unlawful and intentional schemes to defraud and cheat Plaintiffs and Class Members. As a direct and proximate result of Defendants' (and the Clergy's) conspiracy to commit (and committing) the above-referenced wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence through the Church Enterprise, *inter alia*, (i) Plaintiffs and Class Members have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages to themselves, their businesses, and/or their property, (ii) Defendants maintained (and will continue to maintain) their reputations and maintained and expanded (and will continue to maintain and expand) their commercial operations in the United States whereby Defendants and the Enterprise obtained (and will

continue to obtain) money, funds, credits, assets, and/or other property, and (iii) Defendants have wrongfully shifted the risk, expense, and pain, and suffering of the Clergy sexual abuse to Plaintiffs and Class Members and robbed them of their childhood, youth, innocence, virginity, families, jobs, finances, assets—in short, their lives. Defendants' schemes to defraud also amounted to a cheat against Plaintiffs and Class Members. Defendants intentionally engaged in these wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence to their financial and reputational benefit and to Plaintiffs' and Class Members' personal, mental, psychological, and financial detriment—and continue to do so.

123.    Defendants knew or recklessly should have known that conspiring to engage in (and engaging in) the above-described unlawful and intentional schemes to defraud and to cheat, wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence were fraudulent, misleading and illegal, and would cause Plaintiffs and Class Members to suffer the above-referenced damages. All of Plaintiffs' and Class Members' damages were reasonably foreseeable by Defendants and/or anticipated as a substantial factor and a natural consequence of their open-ended, ongoing, and continuous pattern of unlawful activity.

124.    Defendants' above-described unlawful and intentional schemes to conspire to defraud and to cheat, and commit the above-referenced wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence violated (and continue to violate) 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c) by way of 18 U.S.C. §§ 1341; 1343.

## COUNT III

## ASSAULT

**(On Behalf of the Nationwide Class Against Both Defendants Under the Doctrine of *Respondeat Superior*, Agency Theory, and/or the Command Responsibility Doctrine)**

125.    The preceding factual statements and allegations are incorporated by reference.

126.    While under Defendants' employment, command, supervision, direction, and control, Catholic Clergy abused their positions of power, authority, trust, and confidence, and (i) intentionally, knowingly, and/or recklessly instigated and engaged in the inappropriate, unauthorized, forced, unjustified, and wrongful physical contact and sexual abuse of Plaintiffs and Class Members when they were minors and without their consent, (ii) intentionally failed to report such sexual abuse to law enforcement or other responsible authorities as required by law, and (iii) intentionally and actively instigated, perpetrated, and participated in multiple schemes to cover up such sexual abuse.

127.    Defendants and the Clergy knew or reasonably should have believed that Plaintiffs and Class Members would regard the above-described inappropriate, unauthorized, forced, unjustified physical contact and sexual abuse and subsequent cover-up as wrongful and offensive, which, in fact, it was (and continues to be). As a direct and proximate result of Defendants' (and the Clergy's) above-described wrongful conduct, Plaintiffs and Class Members have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages. Defendants' (and the Clergy's) above-described wrongful actions—while the Clergy was under Defendants' employ, command, supervision, direction, and control—constitute assault at common law under the doctrine of *respondeat superior*, agency theory, and/or the command responsibility doctrine.

## COUNT IV

## BREACH OF FIDUCIARY DUTY

**(On Behalf of the Nationwide Class Against Both Defendants Directly and Under the Doctrine of *Respondeat Superior*, Agency Theory, and/or the Command Responsibility Doctrine)**

128.     The preceding factual statements and allegations are incorporated by reference.

129.     While the Clergy was under Defendants' employ, command, supervision, direction, and control, Plaintiffs and Class Members, as parishioners, trusted the Clergy and other of Defendants' members, officers, employees, agents and representatives who sexually abused them to provide them with sound spiritual guidance and act in Plaintiffs' and Class Members' best interests. The Clergy and Defendants' members, officers, employees, agents and representatives who sexually abused Plaintiffs and Class Members were in positions of power and influence over Plaintiffs and Class Members. Such personal and moral relationships between Plaintiffs and Class Members, on the one hand, and the Clergy and Defendants, on the other hand, were confidential, special, and fiduciary relationships, pursuant to which Defendants had a duty to, *inter alia*, guide, lead, and protect Plaintiffs and Class Members—not allow them to be sexually abused by the Clergy, conceal the Clergy's wrongful conduct when discovered, move the abusive Clergy from parish to parish, without warning church members or the general public, thereby further facilitating their predatory practices, refuse to report the abusive Clergy to law enforcement or other responsible authorities as required by law, and even promote the abusive Clergy. Plaintiffs and Class Members expected and, in fact, trusted Defendants and the Clergy to engage in lawful and appropriate relationships with them and, in fact, Defendants and the Clergy were well-aware of Plaintiffs' and Class Members' expectations of trust and confidence that Defendants and the Clergy would do so.

130.     As fiduciaries, Defendants and the Clergy owed Plaintiffs and Class Members (i) the commitment to deal fairly and honestly, (ii) the duties of good faith and undivided loyalty, and (iii) integrity of the strictest kind. Defendants and the Clergy were obligated to exercise the highest degree of care in carrying out their above-described obligations to Plaintiffs and Class Members as spiritual leaders and confidants under the Parties' confidential, special, and fiduciary relationships.

131.     Defendants and the Clergy, however, breached their fiduciary duty to Plaintiffs and Class Members by, *inter alia*, (i) intentionally, knowingly, and/or recklessly instigating and engaging in, facilitating, and/or allowing the inappropriate, unauthorized, forced, unjustified, and wrongful rape and sexual abuse of Plaintiffs and Class Members, when they were minors and without their consent, (ii) intentionally failing and refusing to report such wrongful child sexual abuse to law enforcement or other responsible authorities as required by law, and (iii) intentionally and actively instigating, perpetrating, and participating in multiple schemes to cover up such wrongful child sexual abuse. In breaching their duties to Plaintiffs and Class Members, Defendants and the Clergy acted intentionally, wantonly, recklessly, and with a complete disregard for Plaintiffs' and Class Members' rights and interests, and the consequences of their actions.

132.     As a direct and proximate result of Defendants' and the Clergy's above-described wrongful conduct, Plaintiffs and Class Members have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, compensatory, and economic damages. Defendants' (and the Clergy's) above-described wrongful and abusive conduct—while the Clergy was under Defendants' employ, command, supervision, direction, and control—constitutes breach of fiduciary duty at common law, both directly and under the doctrine of *respondeat superior*, agency theory, and/or the command responsibility doctrine.

# COUNT V

## NEGLIGENCE/GROSS NEGLIGENCE

**(On Behalf of the Nationwide Class Against Both Defendants Directly and Under the Doctrine of *Respondeat Superior*, Agency Theory, and/or the Command Responsibility Doctrine)**

133.    The preceding factual statements and allegations are incorporated by reference.

134.    To establish a negligence claim, there must be (i) a legal duty on the part of the defendant to conform to a certain standard of conduct to protect others against unreasonable risks, (ii) a breach of that duty, (iii) a proximate cause between the conduct and the resulting injury, and (iv) actual damages to the claimant's person or property. Foreseeability that an injury might result from the act complained of normally serves as the paramount factor in determining the existence of a duty. When deciding if some injury was reasonably foreseeable, whether expressly or implicitly, courts examine what the actor knew or should have known.

135.    Defendants knew that if they failed to exercise reasonable care and safeguard and protect Plaintiffs and Class Members—rather than facilitate and allow them to be sexually abused by the Clergy while they were minors, conceal the Clergy's wrongful conduct when discovered, move the abusive Clergy from parish to parish, without warning church members or the general public, thereby further facilitating their predatory practices, refuse to report the abusive Clergy to law enforcement or other responsible authorities as required by law (and even promote the abusive Clergy), and fail and refuse to institute comprehensive protocols and procedures to compensate victims and protect children and their families from abusive Clergy going forward—that Plaintiffs and Class Members would suffer the physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages they, in fact, have suffered (and will continue to suffer).

136.    It was also imminently foreseeable to Defendants that if they failed to exercise

50

reasonable care and safeguard and protect Plaintiffs and Class Members—rather than facilitate and allow them to be sexually abused by the Clergy while they were minors, conceal the Clergy's wrongful conduct when discovered, move the abusive Clergy from parish to parish, without warning church members or the general public, thereby further facilitating their predatory practices, refuse to report the abusive Clergy to law enforcement or other responsible authorities as required by law (and even promote the abusive Clergy), and fail and refuse to institute comprehensive protocols and procedures to compensate victims and protect children and their families from abusive Clergy going forward—that Plaintiffs and Class Members would suffer the physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages they, in fact, have suffered (and will continue to suffer). There is no other foreseeable group of individuals who would be directly and/or proximately injured or harmed by Defendants' and the Clergy's above-described wrongful conduct other than Plaintiffs and Class Members, the sexual abuse victims.

137.    As such, Defendants had (and continue to have) a legal duty to Plaintiffs and Class Members to comply with certain standards of conduct and, *inter alia*,  (i) safeguard and protect Plaintiffs and Class Members from Clergy sexual predators, (ii) discipline known offenders (rather than harboring them, protecting them, and moving them from parish to parish and covering up and further facilitating their abhorrent behavior), (iii) report sexual predator Clergy to law enforcement or other responsible authorities as required by law, (iv) institute policies of transparency, disclosing in the public record the names of all known Clergy with plausible allegations of sexual misconduct against, releasing all corresponding documents and information, and terminating and expelling such offenders from Defendants' employ, (v) publicly admit their wrongdoing, (vi) personally apologize to Plaintiffs and Class Members, and (vii) institute comprehensive protocols and procedures to compensate victims and protect

children and their families from abusive Clergy going forward.

**138.**    Defendants duty to comply with these standards of conduct and protect Plaintiffs and Class Members from the physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages they, in fact, have suffered (and will continue to suffer) at the hands of Defendants and the Clergy also arose out of the above-described fiduciary relationships and relationships of trust and confidence between the parties resting on sound public policy as derived from a calculus of factors, including, *inter alia*, the (i) social and theological consensus that clergy/parishioner relationships—especially when the parishioners are vulnerable minors—are sacred and worthy of protection (they are), (ii) foreseeability of the physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages that Plaintiffs and Class Members, in fact, have suffered (and will continue to suffer) at the hands of Defendants and the Clergy, (iii) moral blame society attaches to the sexual abuse of minor children by the Clergy and other powerful persons in leadership positions (it's severely disfavored), and (iv) prevention of future physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages to the victims and future victims (*i.e.*, future injury and harm could (and very well will) occur if Defendants fail to, *inter alia*, (a) protect minor children from abusive Clergy, (b) end their policies, procedures, and schemes of moving abusive Clergy from parish to parish and covering up their wrongful conduct, (c) discipline known offending Clergy, (d) report sexual predator Clergy to law enforcement or other responsible authorities as required by law, (e) institute policies of transparency, disclosing in the public record the names of all known Clergy with plausible allegations of sexual misconduct against, releasing all corresponding documents and information, and terminating and expelling such offenders from Defendants' employ, (f) publicly admit their wrongdoing, and (g) institute comprehensive protocols and procedures to compensate

victims and protect children and their families from abusive Clergy going forward.).

**139.** Defendants duty to comply with these standards of conduct and protect Plaintiffs and Class Members from the physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages they, in fact, have suffered (and will continue to suffer) at the hands of Defendants and the Clergy also arose out of the customary international law regarding human rights and various human rights conventions, including, *inter alia*, the *Universal Declaration of Human Rights* and the *Convention on the Rights of the Child*, which Defendant Holy See signed and ratified, as well as the 1983 Code.

**140.** Defendants negligently, or in a grossly negligent manner, breached their common law, moral, and other duties to Plaintiffs and Class Members by, *inter alia*, failing to (i) safeguard and protect Plaintiffs and Class Members from Clergy sexual predators, (ii) properly hire, direct, supervise, and control the abusive Clergy, (iii) discipline known offenders (rather than harboring them, protecting them, and moving them from parish to parish and covering up and further facilitating their abhorrent behavior), (iv) report sexual predator Clergy to law enforcement or other responsible authorities as required by law, (v) institute policies of transparency, disclosing in the public record the names of all known Clergy with plausible allegations of sexual misconduct against, releasing all corresponding documents and information, and terminating and expelling such offenders from Defendants' employ, (vi) publicly admit their wrongdoing, (vii) personally apologize to Plaintiffs and Class Members, and (viii) institute comprehensive protocols and procedures to compensate victims and protect children and their families from abusive Clergy going forward.

**141.** As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, conspiracy of silence, negligence, and gross negligence, Plaintiffs and

Class Members have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages. Defendants' (and the Clergy's) above-described wrongful conduct—while the Clergy was under Defendants' employ, command, supervision, direction, and control—constitutes negligence and gross negligence at common law, both directly and under the doctrine of *respondeat superior*, agency theory, and/or the command responsibility doctrine.

## COUNT VI

## NEGLIGENCE *PER SE*

**(On Behalf of the Nationwide Class Against Both Defendants Directly and Under the Doctrine of *Respondeat Superior*, Agency Theory, and/or the Command Responsibility Doctrine)**

     **142.**     The preceding factual statements and allegations are incorporated by reference.

     **143.**     The following state statutes require all persons with knowledge of child sex abuse to report such abuse to law enforcement or other responsible authorities:

Ala. Code § 26-14-3(a); (f)

Alaska Stat. § 47.17.020(d)

Ariz. Rev. Stat. § 13-3620(A); (L)

Ark. Code §§ 12-18-402; 12-18-803(b)

Cal. Penal Code §§ 11166(d); 11165.7(a)(32)-(33)

Colo. Rev. Stat. §§ 13-90-107(1)(c); 19-3-304(2)(aa)

Conn. Gen. Stat. § 17a-101(b)

Del. Code Tit. 16, §§ 903; 909

Fla. Stat. §§ 39.201(1); 39.204

Ga. Code § 19-7-5

Idaho Code § 16-1605

325 Ill. Com. Stat. § 5/4; 735 Ill. Comp. Stat. § 5/8-803

Ind. Code § 31-33-5-1

Ky. Rev. Stat. § 620.030(1), (3)

La. Children's Code Art. 603(17)(b)-(c)

Me. Rev. Stat. Tit. 22, § 4011-A(1)(A)(27)

Md. Code Fam. Law § 5-705(a)(1), (a)(3)

Tenn. Code § 37-1-403(a)

Mass. Gen. Laws Ch. 119, §§ 21; § 51A(j)

Mich. Comp. Laws §§ 722.623; 722.631

Minn. Stat. § 626.556, Subd. 3(a)

Miss. Code § 43-21-353(1)

Mo. Stat. §§ 210.140; 210.115; 352.400

Mont. Code §§ 15-6-201(2)(b); 41-3-201(2)(h), (5)(b)

Neb. Rev. Stat. § 28-711

Nev. Rev. Stat. § 432B.220(3)(d)

N.H. Rev. Stat. §§ 169-C:29; 169-C:32

N.J. Stat. § 9:6-8.10

N.M. Stat. § 32A-4-3(A)

N.C. Gen. Stat. §§ 7B-301; 7B-310

N.D. Cent. Code § 50-25.1-03(1)

Ohio Rev. Code §§ 2151.421(A)(4)(b)-(d); 2151.421(A)(4)(a)

Okla. Stat. Tit. 10A, § 1-2-101

Or. Rev. Stat. §§ 419B.005(3)(h); 419B.010(1)

23 Pa. Cons. Stat. §§ 6311(a); 6311.1

R.I. Gen. Laws §§ 40-11-11; 40-11-3(a)

S.C. Code § 63-7-420

Tenn. Code § 37-1-605(a)

Tex. Fam. Code § 261.101

Utah Code § 62A-4a-403

Vt. Stat. Tit. 33, §§ 4913(a), (h)-(i); 4912(12)

Va. Code § 63.2-1509

Wash. Rev. Code §§ 26.44.030(7); 26.44.060(3)

W.Va. Code §§ 49-2-811; 49-2-803

Wis. Stat. § 48.981(2)(b)

Wyo. Stat. § 14-3-205(a)

Wyo. Stat. § 14-3-210

**144.** By their above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence—more specifically—Defendants' failure to report the above-described Clergy child sexual abuse to law enforcement or other responsible authorities as required by law, Defendants (and the Clergy) violated (and continue to violate) the above-listed statutes.

**145.** By their above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence, Defendants (and the Clergy) also violated (and continue to violate) customary international law regarding human rights and various human rights conventions, including, *inter alia*, the *Universal Declaration of Human Rights* and the *Convention on the Rights of the Child*, which Defendant Holy See signed and ratified, as well as the 1983 Code.

**146.** Plaintiffs and Class Members are clearly within the class of persons the above-

listed statutes, laws, code, and human rights conventions are designed to protect. The physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages they, in fact, have suffered (and will continue to suffer) at the hands of the Clergy and Defendants are precisely the types of damages, injury, and harm the above-listed statutes, laws, code, and human rights conventions are designed to guard against.

147.     As a direct and proximate result of the Clergy's and Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, conspiracy of silence, and violations of the above-listed statutes, laws, and human rights conventions, Plaintiffs and Class Members have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages. Defendants' (and the Clergy's) above-described wrongful conduct—while the Clergy was under Defendants' employ, command, supervision, direction, and control—constitutes negligence *per se* at common law, both directly and under the doctrine of *respondeat superior*, agency theory, and/or the command responsibility doctrine.

## COUNT VII

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(On Behalf of the Nationwide Class Against Both Defendants Directly and Under the Doctrine of *Respondeat Superior*, Agency Theory, and/or the Command Responsibility Doctrine)**

148.     The preceding factual statements and allegations are incorporated by reference.

149.     Defendants' (and the Clergy's) above-described extreme, outrageous, and wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence were committed intentionally and/or recklessly. As a direct and proximate result of such wrongful conduct, Plaintiffs and Class

57

Members have suffered (and will continue to suffer) severe emotional distress. Defendants' (and the Clergy's) above-described wrongful conduct—while the Clergy was under Defendants' employ, command, supervision, direction, and control—constitutes intentional infliction of emotional distress, both directly and under the doctrine of *respondeat superior*, agency theory, and/or the command responsibility doctrine.

## COUNT VIII

## WRONGFUL DEATH AND SURVIVAL ACTIONS

**(On Behalf of the Nationwide Class Against Both Defendants Directly and Under the Doctrine of *Respondeat Superior*, Agency Theory, and/or the Command Responsibility Doctrine)**

150.     The preceding factual statements and allegations are incorporated by reference.

151.     Plaintiffs' and Class Members' legal representatives bring this action in their representative capacity, and on behalf of, a decedent's estate, next of kin, the respective survivors of all Plaintiffs and Class Members who committed suicide as a direct or proximate result of Clergy sexual abuse.

152.     As a direct and proximate cause of Defendants' (and the Clergy's) above-referenced wrongful conduct, certain now-deceased Plaintiffs and Class Members developed severe and debilitating emotional, psychological, and mental issues, which caused them to suffer extreme pain, suffering, and anguish that ultimately drove them to commit suicide.

153.     The legal representatives of such deceased Plaintiffs and Class Members claim damages recoverable under applicable law for all pecuniary and non-pecuniary losses suffered by such deceased Plaintiffs and Class Members by reason of their untimely and wrongful deaths.

154.     As a direct and proximate result of such Plaintiffs' and Class Members' untimely and wrongful deaths, their respective survivors and/or surviving distributees have been (and will continue to be) deprived of the earnings, maintenance, guidance, support, and comfort that they

would have received from such deceased Plaintiffs and Class Members for the rest of their respective natural lives, and have suffered (and will continue to suffer) commensurate pecuniary and non-pecuniary losses because of such Plaintiffs' and Class Members' untimely and wrongful deaths.

155.    Defendants' (and the Clergy's) above-described wrongful conduct—while the Clergy was under Defendants' employ, command, supervision, direction, and control—give rise to these wrongful death and survival actions against Defendants, both directly and under the doctrine of *respondeat superior*, agency theory, and/or the command responsibility doctrine. Such deceased Plaintiffs' and Class Members' legal representatives claim the full measure of damages allowed under applicable law on behalf of the decedents' estates, next of kin, and respective survivors.

**COUNT IX**

**<u>PUBLIC NUISANCE</u>**

**(On Behalf of the Nationwide Class Against Both Defendants)**

156.    The preceding factual statements and allegations are incorporated by reference.

157.    By their above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence, Defendants have taken (and continue to take) affirmative actions to facilitate the sexual abuse of children by the Clergy and conspire to engage, and engage, in ongoing efforts to, *inter alia*, (i) conceal from the general public the child sexual abuse committed by the Clergy, the identities of the abusive clergy, and the predatory tendencies of the abusive Clergy, (ii) attack the credibility of the victims of the Clergy's sexual abuse, (iii) protect the abusive Clergy from criminal prosecution for their sexual abuse of children by concealing their wrongful conduct and engaging in a conspiracy of silence, (iv) moving abusive Clergy from parish to parish, without

59

warning church members or the general public, thereby further facilitating their predatory practices, (v) failing and refusing to report the abusive Clergy to law enforcement or other responsible authorities as required by law (and even promoting the abusive Clergy), and (vi) making affirmative misrepresentations to current or future employers regarding the abusive Clergy's fitness for employment in positions that include working with children—while failing to disclose information regarding the sexual misconduct by such predators.

158.    The abusive Clergy's predatory tendencies coupled with Defendants' facilitation, deception, and concealment of such abuse was (and continues to be) an unreasonable interference with the general public's common right to the comfortable enjoyment of life because children cannot be left unsupervised in any location where abusive Clergy are present. The general public cannot trust the abusive Clergy and/or the Catholic Church. The general public also cannot trust Defendants to, *inter alia*, (i) prohibit and prevent abusive Clergy from supervising, caring for, or having any contact with children, (ii) warn parents of the presence of abusive Clergy, (iii) identify abusive Clergy so as to protect children in the neighborhoods where the abusive Clergy work and live, and (iv) report the abusive Clergy to law enforcement or other responsible authorities as required by law, so they will be criminally prosecuted and identified to the general public as registered sex offenders.  Defendants' secretive conduct also interferes with and causes harm to the general public's right to know that Defendants have concealed (and continue to conceal) decades of sexual abuse by Roman Catholic Clergy.

159.    Defendants' wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence regarding the sexual misconduct of abusive Clergy has caused (and will continue to cause) injury to the general public and seriously imperil children where Defendants have protected and concealed their predatory Clergy from criminal prosecution and registration as sex offenders in situations

where the abusive Clergy voluntarily left Defendants' employ and/or where Defendants expelled such Clergy from the Catholic Church and disavowed any responsibility for the abusive Clergy's wrongful conduct even though Defendants shielded them. As a result of Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence, when Defendants' former abusive Clergy have sought employment in positions of trust with children, Defendants are the only ones aware of the risk posed by the former abusive Clergy, and potential employers, childcare custodians, and parents have no means of identifying the risk to their children posed by former Clergy who should be convicted of child sexual abuse and registered as sex offenders.

160. Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence has endangered the welfare of children by placing them in harm's way, interfered with the interests of the community, and caused damage to the general public—and continues to do so. Defendants' wrongful conduct also has interfered with public health and safety by victimizing thousands of minor children and causing them severe harm and trauma, both physically and emotionally, as well as severe harm and trauma to their family members and friends—and continues to do so. Defendants' wrongful conduct also has interfered with the public morals by breaching the trust of Catholic Church parishioners and community members and holding themselves up as paragons of virtue and spiritual purity while simultaneously concealing and facilitating the criminal acts of its Clergy priests—and continues to do so.

161. As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence, Defendants have created a public nuisance whereby Plaintiffs and Class Members were placed in the custody, care, and control of abusive

Clergy and suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, compensatory, and economic damages.

162.    As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence, Defendants have created a public nuisance whereby children in the general public were (and are) unknowingly placed in the custody, care, and control of abusive Clergy, unaware of the ongoing danger and at a much higher risk than other children for being sexually abused (and, perhaps, sexually abused by such Clergy).

163.    The ongoing and continuing public nuisance created by Defendants was, and continues to be, the proximate cause of the above-described injuries and harm to the general public and the above-described special injuries suffered (and continuing to be suffered) by Plaintiffs and Class Members. Defendants' above-described wrongful conduct constitutes the tort of public nuisance at common law.

## COUNT X

## CONSPIRACY

### (On Behalf of the Nationwide Class Against Both Defendants)

164.    The preceding factual statements and allegations are incorporated by reference.

165.    Defendants, the Clergy, and possibly others, either working together as a combined group or in sub-combinations of two or more, affirmatively conspired to engage in the wrongful actions set forth above. Defendants conspired to commit the wrongful actions outlined in Counts III-IX, above, all of which directly and proximately caused Plaintiffs and Class Members to suffer (and continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, compensatory, and economic damages. Defendants' above-described wrongful conduct constitutes conspiracy at common law.

## COUNT XI

## AIDING AND ABETTING
## (ASSISTING, ENCOURAGING, PARTICIPATING AND/OR CONCERT OF ACTION)

### (On Behalf of the Nationwide Class Against Both Defendants)

166.    The preceding factual statements and allegations are incorporated by reference.

167.    By failing to, *inter alia*,  (i) safeguard and protect Plaintiffs and Class Members from Clergy sexual predators, (ii) discipline known offenders (rather than harboring them, protecting them, and moving them from parish to parish and covering up and further facilitating their abhorrent behavior), (iii) report sexual predator Clergy to law enforcement or other responsible authorities as required by law, (iv) institute policies of transparency, disclosing in the public record the names of all known Clergy with plausible allegations of sexual misconduct against, releasing all corresponding documents and information, and terminating and expelling such offenders from Defendants' employ, (v) publicly admit their wrongdoing, (vi) personally apologize to Plaintiffs and Class Members, and (vii) institute comprehensive protocols and procedures to compensate victims and protect children and their families from abusive Clergy going forward, Defendants have aided, abetted, assisted, facilitated, encouraged, participated in, and engaged in a concert of action with the Clergy (and possibly others) to commit child sexual abuse, cover it up, wrongfully protect the abusive Clergy, wrongfully protect the reputations, commercial activities, and financial interests of Defendants and the Catholic Church in the United States, and in the process, inflict severe physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, compensatory, and economic damages on Plaintiffs and Class Members and put the general public in danger—and continue to do so.

168.    As a direct and proximate result of Defendants' (and the Clergy's) above-described wrongful conduct, Plaintiffs and Class Members have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury,

harm, and economic damages. Defendants' above-described wrongful conduct constitutes aiding and abetting under common law.

## COUNT XII

### MEDICAL MONITORING

**(On Behalf of the Nationwide Class Against Both Defendants)**

**169.** The preceding factual statements and allegations are incorporated by reference.

**170.** As a direct and proximate result of Defendants' (and the Clergy's) above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, conspiracy of silence, Plaintiffs and Class Members have suffered (and will continue to suffer) severe and traumatic pain, suffering, and emotional, psychological, and mental health issues, including, without limitation, depression, fear, anxiety, nightmares, Post Traumatic Stress Syndrome (PTSD), alcohol and substance abuse disorders, loss of friends and family, other negatively impacted personal relationships, loss of consortium, loss of employment, suicidal tendencies, and other serious emotional, psychological, and mental health issues.

**171.** Plaintiffs and Class Members require specialized testing, diagnosis, treatment, and monitoring for these serious emotional, psychological, and mental health issues. The available monitoring regime is reasonably necessary according to contemporary scientific principles within the mental health community specializing in the diagnosis and treatment of these emotional, psychological, and mental health issues.

**172.** By monitoring and testing Plaintiffs and Class Members, any existing emotional, psychological, and mental health issues may be diagnosed and treated, and the risk they will suffer long-term emotional, psychological, and mental health issues will be significantly reduced.

173.     Plaintiffs, for themselves and Class Members, therefore, seek an injunction creating a Court-supervised, medical monitoring program funded by Defendants, which will facilitate the diagnosis and treatment of Plaintiffs' and Class members' emotional, psychological, and mental health issues directly and proximately resulting from Defendants' (and the Clergy's) above-described wrongful conduct. Such program should include a trust fund to pay for the monitoring and treatment of Plaintiffs and Class Members as frequently and appropriately as necessary. Plaintiffs and Class Members have no adequate remedy at law in that monetary damages alone cannot (and would not) compensate them for continuing to suffer from serious emotional, psychological, and mental health issues and economic losses due to the wrongful conduct of individuals claiming to be persons of faith in whom Plaintiffs and Class Members placed their trust and confidence. Without such Court-directed medical monitoring, Plaintiffs and Class Members will continue to suffer serious emotional, psychological, and mental health issues that, in fact, could (and probably will) worsen.

## COUNT XIII

## RESTITUTION

**(On Behalf of the Nationwide Class Against Both Defendants Directly and Under the Doctrine of *Respondeat Superior*, Agency Theory, and/or the Command Responsibility Doctrine)**

174.     The preceding factual statements and allegations are incorporated by reference.

175.     As a direct and proximate result of Defendants' (and the Clergy's) above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, conspiracy of silence, negligence, and gross negligence—while the Clergy was under Defendants' employ, command, supervision, direction, and control—Plaintiffs and Class Members have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and

65

economic damages. As a matter of justice, equity, and good conscience, therefore, Defendants should be compelled to make full restitution to Plaintiffs and Class Members in the form and in an amount to be determined by the trier of fact.

**COUNT XIV**

**<u>DECLARATORY AND INJUNCTIVE RELIEF</u>**

**(On Behalf of the Nationwide Class Against Both Defendants Directly and Under the Doctrine of _Respondeat Superior_, Agency Theory, and/or the Command Responsibility Doctrine)**

176.    The preceding factual statements and allegations are incorporated by reference.

177.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201 _et seq._, the Court is authorized to enter a judgment declaring the Parties' rights and legal relations and grant further necessary relief based upon such a judgment.

178.    An actual controversy exists regarding Defendants' duty to (i) safeguard and protect Plaintiffs and Class Members from Clergy sexual predators, (ii) discipline known offenders (rather than harboring them, protecting them, and moving them from parish to parish and covering up and further facilitating their abhorrent behavior), (iii) report sexual predator Clergy to law enforcement or other responsible authorities as required by law, (iv) institute policies of transparency, disclosing in the public record the names of all known Clergy with plausible allegations of sexual misconduct against, releasing all corresponding documents and information, and terminating and expelling such offenders from Defendants' employ, (v) publicly admit their wrongdoing, (vi) personally apologize to Plaintiffs and Class Members, and (vii) institute comprehensive protocols and procedures to compensate victims and protect children and their families from abusive Clergy going forward. As a direct and proximate result of Defendants' (and the Clergy's) above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, conspiracy of

66

silence, negligence, and gross negligence—while the Clergy was under Defendants' employ, command, supervision, direction, and control—Plaintiffs and Class Members have suffered (and will continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages unless and until the Court enters judgment against Defendants and awards Plaintiffs and Class Members their requested relief.

179.   **DECLARATORY RELIEF.** Pursuant to the Court's authority under the Declaratory Judgment Act, Plaintiffs and Class Members request the Court to enter a judgment declaring, *inter alia*, (i) Defendants owed (and continue to owe) a legal duty to (a) safeguard and protect Plaintiffs and Class Members from Clergy sexual predators, (b) discipline known offenders (rather than harboring them, protecting them, and moving them from parish to parish and covering up and further facilitating their abhorrent behavior), (c) report sexual predator Clergy to law enforcement or other responsible authorities as required by law, (d) institute policies of transparency, disclosing in the public record the names of all known Clergy with plausible allegations of sexual misconduct against, releasing all corresponding documents and information, and terminating and expelling such offenders from Defendants' employ, (e) publicly admit their wrongdoing, (f) personally apologize to Plaintiffs and Class Members, and (g) institute comprehensive protocols and procedures to compensate victims and protect children and their families from abusive Clergy going forward; (ii) by their above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, conspiracy of silence, negligence, and gross negligence, Defendants breached (and continue to breach) such duty; (iii) Defendants' breach of such duty directly and proximately caused Plaintiffs, Class Members, and the general public to suffer (and continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and/or damages; (iv) Plaintiffs and Class Members are legally entitled to recover

compensation from Defendants for such physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages; and (v) Defendants' above-referenced wrongful conduct forming the basis of Defendants' public nuisance and Plaintiffs' request for declaratory relief actually occurred.

180.   **INJUNCTIVE RELIEF.** Defendants' failure to report and account for the rape and sexual abuse of children by its Clergy is a direct violation of the reporting statutes set forth in Count VI, above, which require Defendants to report any known or suspected child abuse. Defendants' above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, and conspiracy of silence also constitute a public nuisance throughout the United States that must be remedied. Defendants' failure to notify law enforcement or other responsible authorities about known or suspected child predators as required by law constitutes a clear and present threat to public safety, an unreasonable interference with rights, and a public nuisance (as set forth above) that can, and should, be remedied by this Court via injunctive relief.

181.   As a direct and proximate result of Defendants' (and the Clergy's) above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, conspiracy of silence, negligence, and gross negligence, Plaintiffs and Class Members have suffered (and will continue to suffer) irreparable harm in the form of, *inter alia*, physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages. Such irreparable harm will not cease unless and until enjoined by this Court.

182.   Plaintiffs, therefore, on behalf of themselves and Class Members, request the Court to enter an injunction compelling Defendants to:

(i)     immediately comply with the above-referenced statutory reporting requirements for all past and future cases of Clergy child sexual abuse;

68

(ii)     terminate the above-described ongoing and continuing public nuisance created by Defendants' failure to (a) safeguard and protect Plaintiffs and Class Members from Clergy sexual predators, (b) discipline known offenders (rather than harboring them, protecting them, and moving them from parish to parish and covering up and further facilitating their abhorrent behavior), (c) report sexual predator Clergy to law enforcement or other responsible authorities as required by law, (d) institute policies of transparency, disclosing in the public record the names of all known Clergy with plausible allegations of sexual misconduct against, releasing all corresponding documents and information, and terminating and expelling such offenders from Defendants' employ, (e) publicly admit their wrongdoing, (f) personally apologize to Plaintiffs and Class Members, and (g) institute comprehensive protocols and procedures to compensate victims and protect children and their families from abusive Clergy going forward;

(iii)    make a full and complete disclosure of all records and information in their possession, custody or control, from 1940 to the present regarding the rape and sexual abuse of children by the Clergy. Plaintiffs further request the Court to (a) appoint a special master to ensure that sensitive information about the Clergy abuse victims remains confidential (unless such information is authorized to be released by a victim), and (b) establish protocols and procedures for Clergy abuse victims to review Defendants' or others' records pertaining to them to verify that they exist, are complete and accurate, and are available to be reviewed by law enforcement and other government officials;

(iv)    issue notice approved by Plaintiffs and the Court to Clergy sexual abuse victims of their right and opportunity to provide additional information as victims or witnesses of Clergy child sexual abuse, such notice to be paid for by Defendants. Plaintiffs further request the Court to establish protocols and procedures for Clergy abuse victims and witnesses to provide such information and place such protocols and procedures under the authority of the special master; and

(v)     establish a medical monitoring fund as set forth above.

**183.**    The injunctive relief sought by Plaintiffs will fill in the gaps in the public record by the immediate, complete, and accurate disclosure of sexual predators known to be dangerous to children, and provide a critical source of information for parents and childcare providers to best protect the children for whom they are responsible, as well as allow them to freely enjoy community and church activities without fear of being exposed to sexual predator Clergy with a known history of abusing children. The disclosure of the identities of persons who Defendants know are dangerous child predators also will provide some redress for the injury and harm Clergy abuse victims have suffered (and will continue to suffer) because of Defendants' (and the

Clergy's) wrongful conduct. Defendants' failure to take responsibility for their wrongful conduct and ongoing and continuing cover-up causes additional injury and harm to Clergy abuse victims each day over and above the injury and harm they already have suffered at the hands of Defendants and the abusive Clergy.

184.　　Plaintiffs and Class Members have no adequate remedy at law in that monetary damages alone cannot (and would not) compensate them for the physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages directly and proximately caused by Defendants' (and the Clergy's) above-described wrongful conduct.

185.　　The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Defendants' longstanding failure and refusal to report and release evidence proving a victim's accusations of Clergy sexual abuse is undeniably punitive. It pits Clergy sexual abuse victims against the denials of formidable authority figures and leads to years of emotional and psychological harm. If, however, the facts are made public, victims are somewhat protected against the inevitable torment and self-blame rises to the surface when memories of sexual abuse are disputed by powerful perpetrators. Better yet, it insures victims the right to proper mental health treatment. Accurate diagnosis and suitable treatment are preluded when accusations remain purposely unverified and the truth is suppressed. On the other hand, Defendants' cost of complying with the requested injunction requiring, for example, Defendants to report Clergy child sexual abuse to law enforcement or other responsible authorities (which they are already required to do), is relatively minimal.

186.　　Issuance of the requested injunction will not disserve the public interest. To the contrary, it would end the above-described public nuisance, protect children and their families from Clergy child sexual abuse going forward, and be a major step in the right direction toward the healing of Clergy sexual abuse victims.

### *RESPONDEAT SUPERIOR*/AGENCY

**187.**    The preceding factual statements and allegations are incorporated by reference.

**188.**    Defendants also are liable for their current and former Clergy's above-described wrongful conduct and child sexual abuse committed by the Clergy during the course and scope of their employment and while the Clergy was under Defendants' employ, command, supervision, direction, and control and the Clergy's respective representation of Defendants under the doctrine of *respondeat superior* and/or agency theory; to wit, such wrongful conduct was committed (i) within the Clergy's general authority while the Clergy was under Defendants' employ, command, supervision, direction, and control, (ii) in furtherance of Defendants' operations and commercial activity in the United States, and (iii) while accomplishing the objectives for which the Clergy were hired—all of which directly and proximately caused Plaintiffs and Class Members to suffer (and continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages.

### COMMAND RESPONSIBILITY DOCTRINE

**189.**    The preceding factual statements and allegations are incorporated by reference.

**190.**    Defendants also are liable for their current and former Clergy's above-described wrongful conduct and child sexual abuse committed by the Clergy while the Clergy was under Defendants' command, supervision, direction, and control under the command responsibility doctrine. The command responsibility doctrine holds superiors liable for their subordinates' wrongful conduct where, as here, with effective and/or de facto control over their subordinates, the superiors knew or should have known about such wrongful conduct and failed to respond appropriately or punish their subordinates in the face of an affirmative duty.

**191.**    As set forth above, and under the hierarchy, management, and operations of the Roman Catholic Church, including Defendant Holy See's command, supervision, direction, and

control of Defendant USCCB and the Catholic Church in America, Defendants had (and continue to have) command, supervision, direction, and control of abusive Catholic Church Clergy. As further set forth above, Defendants know and, in fact, have known for a long time about the above-described rampant child rape and sexual abuse committed by Catholic Clergy in the United States. As further set forth above, Defendants had (and continue have) an affirmative duty to protect children in Catholic Church parishes and the surrounding communities, yet failed (and continue to fail) to take reasonable and necessary measures to, *inter alia*, (i) safeguard and protect Plaintiffs and Class Members from Clergy sexual predators, (ii) discipline known offenders (rather than harboring them, protecting them, and moving them from parish to parish and covering up and further facilitating their abhorrent behavior), (iii) report sexual predator Clergy to law enforcement or other responsible authorities as required by law, (iv) institute policies of transparency, disclosing in the public record the names of all known Clergy with plausible allegations of sexual misconduct against, releasing all corresponding documents and information, and terminating and expelling such offenders from Defendants' employ, and (v) institute comprehensive protocols and procedures to compensate victims and protect children and their families from abusive Clergy going forward.

192.    Defendants, therefore, are liable for their current and former Clergy's above-described wrongful conduct and child sexual abuse under the command responsibility doctrine.

## TOLLING OF THE STATUTES OF LIMITATION

193.    The preceding factual statements and allegations are incorporated by reference.

194.    FRAUDULENT CONCEALMENT. Defendants took active steps to conceal their (and the Clergy's) above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, conspiracy of silence. The details of Defendants' efforts to conceal their (and the Clergy's) unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiffs, and await further discovery. When some of

this material information was revealed to Plaintiffs, they exercised due diligence by investigating the situation, retaining counsel, and pursuing their claims. Defendants fraudulently concealed their (and the Clergy's) wrongful conduct. Should such be necessary, therefore, all applicable statutes of limitation (if any) are tolled under the fraudulent concealment doctrine.

195.   **EQUITABLE ESTOPPEL.** Defendants took active steps to conceal their (and the Clergy's) above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, conspiracy of silence. The details of Defendants' efforts to conceal their (and the Clergy's) unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiffs, and await further discovery. When some of this material information was revealed to Plaintiffs, they exercised due diligence by investigating the situation, retaining counsel, and pursuing their claims. Defendants intentionally concealed their (and the Clergy's) wrongful conduct. Should such be necessary, therefore, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable estoppel.

196.   **EQUITABLE TOLLING.** Defendants took active steps to conceal their (and the Clergy's) above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, conspiracy of silence. The details of Defendants' efforts to conceal their (and the Clergy's) unlawful conduct are in their possession, custody, and control, to the exclusion of Plaintiffs, and await further discovery. When some of this material information was revealed to Plaintiffs, they exercised due diligence by investigating the situation, retaining counsel, and pursuing their claims. Defendants intentionally concealed their (and the Clergy's) wrongful conduct. Should such be necessary, therefore, all applicable statutes of limitation (if any) are tolled under the doctrine of equitable tolling.

## RELIEF REQUESTED

197.   The preceding factual statements and allegations are incorporated by reference.

198.   **ACTUAL, CONSEQUENTIAL, COMPENSATORY, AND ECONOMIC DAMAGES**

**AND/OR RESTITUTION.** As a direct and proximate result of Defendants' (and the Clergy's) above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, conspiracy of silence, Plaintiffs and Class Members have suffered (and continue to suffer) physical and/or mental injury, pain, suffering, and other actual and consequential injury, harm, and economic damages—for which they are entitled to compensation. Alternatively, Plaintiffs and Class Members are entitled to equitable relief in the form of restitution. All damages, injury, and harm suffered (and to be suffered) by Plaintiffs and Class Members were reasonably foreseeable by Defendants. All conditions precedent to Plaintiffs' and Class Members' claims for relief have been performed or occurred.

199. **PUNITIVE DAMAGES.** Defendants' (and the Clergy's) above-described wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, conspiracy of silence were committed willfully, wantonly, and with reckless disregard for Plaintiffs' and Class Members' rights and interests. Accordingly, Plaintiffs and Class Members also are entitled to punitive damages from Defendants as punishment and to discourage such wrongful conduct in the future. All conditions precedent to Plaintiffs' and Class Members' claims for relief have been performed or occurred.

200. **RICO TREBLE DAMAGES.** Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and Class Members also are entitled to automatic treble damages for Defendants' (and/or their co-conspirators') above-described unlawful and intentional schemes and conspiracy to defraud and to cheat, and commit the above-referenced wrongful actions, inaction, omissions, cover-up, deception, and concealment, obstructive behavior regarding investigations, in violation of 18 U.S.C. §§ 1962(c);(d).

201. **DECLARATORY AND INJUNCTIVE RELIEF.** Plaintiffs and Class Members also are entitled to the declaratory and injunctive relief set forth above, including, without limitation, a

medical monitoring fund for the testing, diagnosis, and treatment of their emotional, psychological, and mental health issues directly and proximately resulting from Clergy child sexual abuse and Defendants' above-described wrongful conduct. All conditions precedent to Plaintiffs' and Class Members' claims for relief have been performed or occurred.

202.    **ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS.** Plaintiffs and Class Members also are entitled to recover their attorneys' fees, litigation expenses, and court costs under, *inter alia*, 18 U.S.C. § 1964(c). All conditions precedent to Plaintiffs' and Class Members' claims for attorneys' fees, litigation expenses, and court costs have been performed or occurred.

**WHERFORE,** Plaintiffs, for themselves and Class Members, respectfully request that (i) Defendants be cited to appear and answer this lawsuit, (ii) this action be certified as a class action, (iii) Plaintiffs be designated the Class Representatives, and (iv) Plaintiffs' counsel be appointed Class Counsel. Plaintiffs, for themselves and Class Members, also request that upon final trial or hearing, judgment be awarded against Defendants in their favor for:

### RICO COUNTS

(i)    With respect to Counts I–II (violations of 18 U.S.C. § 1961, *et seq.*)—(a) threefold the actual, consequential, compensatory, economic, and/or incidental damages sustained by Plaintiffs and Class Members, along with attorneys' fees, litigation expenses, and court costs, all pursuant to 18 U.S.C. § 1964(c), together with pre- and post-judgment interest at the highest legal rates, (b) equitable relief, as may be appropriate, and (c) such other and further relief the Court deems just and proper, all pursuant to 18 U.S.C. § 1964(a) or other law;

### COMMON LAW COUNTS

(ii)    compensatory damages (or, in the alternative, restitution) in an amount to be determined at trial;

(iii)    economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial;

(iv)    punitive damages;

(v)    declaratory and injunctive relief (as set forth above), including, without limitation, the establishment of a medical monitoring fund for the testing, diagnosis, and

treatment of Plaintiffs' and Class Members' emotional, psychological, and mental health issues directly and proximately resulting from Clergy child sexual abuse and Defendants' wrongful conduct.;

(vi)    pre- and post-judgment interest at the highest legal rates;

(vii)   attorneys' fees, litigation expenses, and court costs through the trial and any appeals of this case; and

(viii)  such other and further relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs, for themselves and all others similarly situated, respectfully demand a trial by jury on all claims so triable.

Date: November 13, 2018.

Respectfully submitted,

By: /s/ Henry C. Quillen
Henry C. Quillen (D.C. Bar #986686)
**WHATLEY KALLAS, LLP**
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Telephone: (603) 294-1591
Facsimile: (800) 922-4851
Email: hquillen@whatleykallas.com

Richard L. Coffman (to apply *pro hac vice*)
**THE COFFMAN LAW FIRM**
First City Building
505 Orleans St., Fifth Floor
Beaumont, TX 77701
Telephone: (409) 833-7700
Facsimile: (866) 835-8250
Email: rcoffman@coffmanlawfirm.com

Mitchell A. Toups (to apply *pro hac vice*)
**WELLER, GREEN TOUPS & TERRELL, LLP**
2615 Calder Ave., Suite 400
Beaumont, TX 77702
Telephone: (409) 838-0101
Facsimile: (409) 838-6780
Email: matoups@wgttlaw.com

Joe R. Whatley, Jr. (to apply *pro hac vice*)
**WHATLEY KALLAS, LLP**
1180 Avenue of the Americas, 20th Floor
New York, NY 10036
Telephone: (212) 447-7011
Facsimile:  (800) 922-4851
Email: jwhatley@whatleykallas.com

**ATTORNEYS FOR PLAINTIFFS AND THE
PUTATIVE CLASS**